**UNITED STATES ex rel. Patricia S. MIKES, and Patricia S. Mikes, Individually, Plaintiffs,**

**v.**

**Marc J. STRAUS, Jeffrey M. Ambinder and Eliot L. Friedman, Defendants.**

**No. 92 Civ. 2754(CM).**

United States District Court, S.D. New York.

Nov. 18, 1999.

Order Denying Reconsideration Dec. 10, 1999.

428

Harold R. Burke, Holland, Kaufman & Bartels, LLC, Greenwich, CT, for Plaintiffs.

Mary Beth Kilgannon, Meiselman, Farber, Packman & Eberz, P.C., Mt. Kisco, NY, David J. Meiselman, Barry B. Cepelewicz, M.D., Meiselman, Farber, Packman & Eberz, P.C., Mount Kisco, NY, for Defendants.

### MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge.

Patricia Mikes, M.D., a former employee of Defendants Marc Straus, M.D., Jeffrey Ambinder, M.D., and Eliot Friedman, M.D., brought an action following her termination as qui tam relator and as plaintiff in her individual capacity against Defendants under the False Claims Act, 31 U.S.C. § 3729 *et seq.* (1994) ("FCA") for (1) submission of fraudulent Medicare claims based on improperly performed spirometry tests, (2) use of false records of spirometry tests to obtain Medicare reimbursement, and (3) conspiracy by Defendants to defraud the Government by filing false Medicare claims. Defendants counterclaimed for extortion. Defendants have moved for summary judgment on Mikes's FCA claims, and Mikes has cross-moved for partial summary judgment on the first two elements of her FCA claims. For the reasons that follow, Defendants' motion is granted in its entirety.

*Background*

Defendants are physicians licensed in New York who specialize in oncology and hematology. In or around 1991, Defendants formed Pulmonary and Critical Care Associates ("PCCA"), a medical practice with a focus on treatment of pulmonary, or lung-related, conditions, which maintains offices in various locations in Westchester and Putnam Counties. Mikes, a pulmonologist, was employed by PCCA beginning on or about July 1, 1991, and was based in PCCA's White Plains office. She was hired pursuant to an employment contract, which allowed PCCA to terminate her with or without cause, and provided that cause included failure to maintain consulting and admitting privileges at local hospitals.

Mikes avers that in the fall of 1991, she met with Defendant Straus to express her concerns about the administration of spirometry tests, which are used to measure the speed and volume at which patients can exhale, to patients at PCCA.[1] Specifically, Mikes alleges that she told Straus that the test results might not be accurate because the equipment was not being calibrated using a three-liter syringe or checked for calibration on a daily basis and after being moved, as per the recommendation of the American Thoracic Society (ATS). She further claims that she voiced her worry to Straus over the fact that the tests were being performed by foreign medical school graduates, employed as medical assistants, who she felt were inadequately trained to perform the tests. Mikes also claims that she requested that PCCA purchase a calibration syringe for the purpose of ensuring the accuracy of spirometry tests, and offered to train the medical assistants who carried out the tests.

Subsequent to this conversation, Mikes's employment relationship with Defendants deteriorated, for reasons disputed by the parties. Mikes contends that Defendants became hostile toward her as a result of her expressed disapproval of the performance of spirometry tests at PCCA. Defendants respond that tension developed between Mikes and themselves due to contentious behavior by Mikes toward her peers and incompetence with respect to patients. Whatever the reason, Mikes was

---

1. Spirometry tests, according to Defendants, are used to evaluate pulmonary function, particularly in patients who are being treated with anti-cancer drugs that entail the potential side effect of pulmonary toxicity. (Def. Br. at 4 n. 1.)

denied hospital privileges by Hudson Valley Community Hospital (at that time Peekskill Hospital). In accordance with the terms of her employment contract, Defendants terminated Mikes on or about December 16, 1991.

Mikes brought the present action on April 16, 1992. The case comes before this Court following a lengthy procedural history. In May 1994, Mikes's original five-count complaint, including claims for unwarranted and improperly performed spirometry and Magnetic Resonance Imaging (MRI) tests under the FCA, retaliatory discharge under the FCA and New York Labor Law, and unpaid wages under the New York Labor Law, was dismissed by Judge Broderick of this Court for, *inter alia*, failing to plead fraud with particularity pursuant to Fed.R.Civ.P. 9(b). *See United States ex rel. Mikes v. Straus*, 853 F.Supp. 115, 117 (S.D.N.Y.1994). Mikes then filed a First Amended Complaint containing the same claims, and Defendants moved again to dismiss under Fed.R.Civ.P. 9(b) and 12(b)(6), or alternatively, to compel arbitration. In June 1995, Judge Conner, to whom the case had been reassigned, converted Defendants' motion *sua sponte* into a motion for summary judgment. Emphasizing the procedural posture of the case, the Court stated that it did not expect Mikes to be able to detail every aspect of Defendants' alleged FCA violations prior to discovery, and concluded that Mikes's affidavit outlining Defendants' overuse and negligent administration of spirometry tests was sufficient for her to avoid summary judgment on her fraud claims under the FCA at that stage of the litigation. *See Mikes*, 889 F.Supp. 746, 751–52. Judge Conner also ordered arbitration of Mikes's state claims as well as her retaliatory discharge claim under the FCA. *See id.* at 755–57. In March 1996, Mikes filed a Second Amended Complaint reiterating her allegations with respect to the performance of spirometry and MRI tests by Defendants. Following various other motions relating to Defendants' affirmative defenses and counterclaims and ex-

tension of discovery, Mikes filed a Supplemental Complaint in July 1999, in which she withdrew her claims relating to MRI tests. The Supplemental Complaint alleges that Defendants filed for Medicare reimbursements for spirometry tests that were knowingly (a) performed in an inappropriate and improper manner by untrained and unsupervised medical assistants; (b) performed on equipment that was not calibrated, such that a reasonable person would know that useless and inaccurate results would be obtained; and (c) performed when the condition of the patient did not warrant its administration. (Mikes Supp. Cmplt. at 11–12.) The case was reassigned to me shortly after the filing of the Supplemental Complaint. On August 17, 1999, the U.S. Attorney gave notice to the Court of its intention not to intervene in the action.

In their Answer to Mikes's Second Amended Complaint, Defendants asserted a counterclaim against Mikes for extortion on the basis of her FCA suit. As of October 13, 1999, Mikes had not filed a responsive pleading with respect to the counterclaim, and on that date Defendants filed a Motion for Entry of Default under Fed.R.Civ.P. 55(a), which was denied at oral argument before this Court on October 29, 1999.

*Standard for Summary Judgment*

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. In making its determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255, 106 S.Ct. 2505. To defeat summary judgment, the non-moving party

must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

*False Claims Act*

The FCA, as amended, imposes liability on any person who (1) "knowingly presents, or causes to be presented, to ... the United States Government ... a false or fraudulent claim for payment or approval, (2) 'knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government,' " or (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. § 3729(a)(1)-(3). The statute defines "knowingly" as meaning that an individual has "actual knowledge" of the information, acts in "deliberate ignorance" of the truth or falsity of the information, or acts in "reckless disregard" of the truth or falsity of the information, and provides that "no proof of specific intent to defraud is required." § 3729(b)(1)-(3). A private individual—the qui tam relator—may bring an action for a violation of § 3729 on his or her own behalf as well as that of the Government. *See* § 3730(b)(1).

■■■ To prevail on a claim under § 3729(a)(1), a relator must establish four things: (1) the defendant presented or caused to be presented a claim to the United States for payment or approval; (2) the claim was false or fraudulent; (3) the defendant knew the claim was false or fraudulent; and (4) the United States suffered damages as a result of the false or

fraudulent claim. *See Blusal Meats, Inc. v. United States,* 638 F.Supp. 824, 827 (S.D.N.Y.1986)(stating elements of same claim under pre-amendment subsection), *aff'd,* 817 F.2d 1007 (2d Cir.1987). Similarly, a plaintiff bringing a claim under § 3729(a)(2) must show that (1) the defendant made or used, or caused to be used, a record or statement to get a claim against the United States paid or approved; (2) the record or statement and the claim it supported were both false or fraudulent; and (3) the defendant knew that the record or statement and the claim it supported were false or fraudulent, and (4) the United States suffered damages as a result of the false or fraudulent claim. *See id.* Finally, to satisfy the elements of a conspiracy to defraud claim under § 3729(a)(3), a plaintiff is required to demonstrate that (1) the defendant conspired with one or more persons to get a false or fraudulent claim allowed or paid by the United States, (2) one or more conspirators performed any act to effect the object of the conspiracy, and (3) the United States has suffered damages as a result of the false or fraudulent claim. *See id.* at 828.

■■■ The parties do not appear to dispute that Defendants made "claims" within the meaning of the FCA when they submitted claims for Medicare reimbursements for the spirometry tests that they performed on patients at PCCA. Rather, Defendants challenge Mikes's contention that the Medicare claims made by Defendants were false or fraudulent. Defendants correctly point out that Mikes is unable to point to a single identifiably false claim made during her employment at PCCA.[2] Instead, she cites a number of

---

**2.** Mikes testified as follows:

> Q. [C]an you tell us what patient files you reviewed to form the basis of that complaint [to Straus regarding inaccurate results]?
>
> . . .
>
> A. You're asking for names, I can't—
>
> Q. Any way you can describe it.
>
> A. I can't give you names.
>
> . . .

> Q. You can think of no way to identify a single patient whose file you are referring to in this complaint?
>
> A. Not at this time I can't.
>
> . . .
>
> Q. Okay. Well, other than our taking your word for it, how are we supposed to know whether these claims are true or not?
>
> A. I don't have, I don't have an answer for you at this point. At the time when I took the issue to Dr. Straus, there would have been

documentary sources describing the standard of care for the administration of spirometry tests, most prominently, the guidelines promulgated by the American Thoracic Society (ATS), which recommend daily calibration of spirometers using a three-liter syringe. Mikes claims that Defendants' failure to follow the ATS recommendation amounts to a breach of the applicable standard of care, so that Defendants' Medicare submissions were based on negligently performed spirometry tests. For this reason, she argues, Defendants' Medicare claims were fraudulent within the meaning of the FCA. I note first that Mikes has failed to demonstrate that the ATS guidelines in fact constitute the standard of care for operation of spirometers, let alone that Medicare claims for spirometry not performed in compliance with those guidelines may be deemed fraudulent under the FCA. But even had she made this showing, her proposition that Defendants' alleged professional negligence is actionable under the Act is incorrect. Submitting a claim to the Government for a service that was not provided in accordance with the relevant standard of care, however, without more, does not render that claim false or fraudulent for FCA purposes. *See Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1478 (9th Cir.1996), *cert. denied,* 519 U.S. 865, 117 S.Ct. 175, 136 L.Ed.2d 116 (1996); *United States ex rel. Milam v. Regents of the Univ. of Cal.,* 912 F.Supp. 868, 886 (D.Md. 1995) ("Disagreements over scientific methodology do not give rise to False Claims Act liability"); *United States ex rel. Boisjoly v. Morton Thiokol,* 706 F.Supp. 795, 810 (D.Utah 1988) (Engineering judgment "is clearly not a statement of fact that can be said to be either true or false, and thus cannot form the basis of a FCA claim").

■ However, Mikes also invokes 42 U.S.C. § 1320c–5(a), a provision of the Social Security Act that prescribes various standards to which physicians must adhere in order to qualify for the Medicare program. That section requires that any "health care practitioner" who provides health care services for which payment may be made pursuant to Medicare "to assure … that services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this chapter (1) will be provided economically and only when, and to the extent, medically necessary; (2) will be of a quality which meets professionally recognized standards of health care; and (3) will be supported by evidence of medical necessity and quality in such form and fashion and at such time as may reasonably be required by a reviewing peer review organization in the exercise of its duties and responsibilities." Compliance with these standards is a requirement for reimbursement under the Medicare program. A violation of any of them by a health care provider may result in the sanction of exclusion from Medicare or imposition of fines at the discretion of the Secretary of Health and Human Services. *See* § 1320c–5(b)(1), (3).

Mikes argues that Defendants' spirometry practices failed to meet professionally recognized standards of health care. From this, she reasons that their Medicare claims violated the "legal requirement" of § 1320c–5(a), thereby rendering those claims *per se* false under the FCA. (Mikes Brief at 14.) This assertion is wrong as a matter of law.

many ways for us to investigate it had we worked together.

. . .

Q. . . . I'm asking you if you can identify in any way, shape or form a single patient whose chart we can go back to, and you'll know we are going back to it because you'll identify it for us, where the results would be, as you say, inconsistent as to be unusable.

A. I can't give you any patient names or any identifiable information right now. As I am thinking of it now I can't give you anything that would allow you to go back to a specific file. (Deposition of Patricia Mikes, Attached as Exhibit 8 to Defendants' Notice of Motion at 122–26.)

Mikes's argument seems to allude to—but does not mention by name—the theory of "false implied certification." Articulated by the Federal Court of Claims in *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (1994), *aff'd*, 57 F.3d 1084 (Fed.Cir.1995), this theory holds that a claim made in contravention of statutory or regulatory requirements may be deemed "false" under the FCA in cases where the defendant's certification of compliance with the statutes and regulations in question is a condition of receiving funds from the Government. In recent years, however, in an increasing number of actions involving allegedly substandard medical care brought under the False Claims Act, the Government has attempted to extend the scope of the theory by arguing that a health care provider at least impliedly certifies that it has complied with the applicable standards of care in *all* cases where it submits a request to Medicare for reimbursement. Put otherwise, if the provider breaches the standard of care, its implied representation to the contrary amounts to a false claim within the meaning of the FCA. *See* John R. Munich and Elizabeth W. Lane, *When Neglect Becomes Fraud: Quality of Care and False Claims*, 43 St. Louis U.L.J. 27, 36 (1999).

The Second Circuit does not appear to have addressed this theory. However, in *Luckey v. Baxter Healthcare Corp.*, 2 F.Supp.2d 1034, 1045 (N.D.Ill.1998), *aff'd*, 183 F.3d 730 (7th Cir.1999), *petition for cert. filed*, — U.S. —, 120 S.Ct. 562, 145 L.Ed.2d 439 (1999), a case with facts highly similar to those at bar, the Seventh Circuit squarely rejected this argument. The plaintiff in *Luckey*, a former laboratory technician for the defendant, alleged that she alerted her supervisors that the defendant's failure to test colorless blood plasma samples for possible saline contamination created a risk of inaccurate results as reported by the defendant to the Food and Drug Administration ("FDA"). She contended that her warnings were rebuffed by management. In the meantime, Luckey's employment relationship with the defendant had deteriorated, as reflected in her numerous job performance evaluations during her four-year tenure, and she brought suit prior to being terminated for various disciplinary infractions. She argued that the defendant's non-compliance with the regulatory standard of care placed the defendant in violation of various federal statutes and regulations pertaining to licensing for the production of plasma products, accuracy of test results, and laboratory control procedures. Raising the implied certification theory, Luckey contended that every time the defendant had presented a claim to the Government for payment, it impliedly certified its compliance with those regulations, so that its claims as submitted—i.e., the results of negligently performed tests—were fraudulent under the FCA.

The Seventh Circuit rejected Luckey's argument and upheld the district court's decision granting summary judgment against her False Claims Act complaint. The district court distinguished the case from *Ab-Tech*, noting that the defendant in *Ab-Tech* had been required to submit a "Statement of Cooperation" included on the Government's payment vouchers. The Statement attested to the claimant's cooperation with the requirements for eligibility in a Small Business Administration ("SBA") program for minority-owned businesses. The *Ab-Tech* Court ruled that the defendant's submission of the vouchers amounted to an implied certification of compliance with the applicable provisions of the Small Business Act. *See Ab-Tech*, 31 Fed. Cl. at 434. The *Luckey* Court observed that in *Ab-Tech*, compliance with SBA requirements was "at the heart of the parties' agreement," such that the defendant's failure to utilize minority-owned businesses was a "material breach" of its contract with the Government. *See Luckey*, 2 F.Supp.2d at 1044–45. Because Ab-Tech had in fact not complied with the SBA rules, it was liable. By contrast, the relator in *Luckey* failed to show that the defendant's compliance with regulations

mandating that physicians adhere to the professional standard of care was a material condition to receipt of funds from the Government. More specifically, the district court in *Luckey* concluded that the relator's failure to demonstrate that the FDA would have withheld payment had the defendant in fact failed to identify contaminated samples was fatal to her FCA claim. Absent such a showing, the Court reasoned, there was no evidence that the defendant had violated the "heart of its agreement" with the Government. *See id.* at 1045. The Court further stressed that "the FCA is not a vehicle for regulatory compliance," and for that reason, a finding of false implied certification under the Act "for every request for payment accompanied by a failure to comply with all applicable regulations, without more, improperly broadens the intended reach of the FCA." *See id.* In the Seventh Circuit's decision upholding this conclusion, Judge Easterbrook cited *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1019 (7th Cir.1999), which held that mere technical violations of a federal regulation upon which a claim is based do not make the claim "false," noting that Luckey (like Mikes in the present case) had not even established that a regulatory violation had occurred. *See Luckey,* 183 F.3d at 733.

Other courts have similarly construed the implied false certification theory. In *United States ex rel. Hopper v. Anton,* 91 F.3d 1261 (9th Cir.1996), the Ninth Circuit declined to find implied certification for FCA purposes where the relator, a public school teacher, alleged that the school district violated California's Education Code by conducting evaluations of potential special education students without the participation of classroom teachers. *See id.* at 1265. The relator argued that the district committed actionable fraud under the FCA by annually submitting forms to the California Department of Education indicating the number of special education students in the district, based on a calculation performed in violation of controlling regulations. In rejecting her argument, the Court noted that, because California apportioned money for special education expenses according to criteria apart from the number of students, the relator had failed to demonstrate that the funds at issue were conditioned upon regulatory compliance by the district. *See id.* at 1266. Significantly, the Court went on to instruct that "[v]iolations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification *of compliance* which creates liability when certification is a prerequisite to obtaining a government benefit" (emphasis added). *Id.*

Consistent with *Anton,* the Fifth Circuit in *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899 (5th Cir.1997) determined that an FCA claim based on the defendant's submission of Medicare claims for services rendered in violation of the Medicare anti-kickback statute and related laws could not be dismissed under Fed.R.Civ.P. 12(b)(6), precisely because the relator had alleged that the defendants were required to certify, in annual cost reports, that their services were supplied in compliance with federal laws and regulations governing healthcare services. *See id.* at 902. The payments at issue could therefore be characterized as having been "conditioned upon certification of compliance" with the applicable law. *See id.*

Cases such as *Luckey, Anton,* and *Thompson,* taken together, can be read to stand for the proposition that implied false certification is to be found only in those exceptional circumstances where the claimant's adherence to the relevant statutory or regulatory mandates lies at the core of its agreement with the Government, or, in more practical terms, where the Government would have refused to pay had it been aware of the claimant's non-compliance. Outside that context, as the Seventh Circuit concluded in *Lamers,* "the FCA is not an appropriate vehicle for policing

technical compliance with administrative regulations." *See Lamers*, 168 F.3d at 1020.

Mikes relies on the only case that finds that a defendant's non-compliance with 1320c–5(a) was actionable as an implied false certification under the FCA. *See United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, Inc.*, 945 F.Supp. 1485 (W.D.Okla.1996). Because I find persuasive the *Luckey* Court's determination that a finding of falsity under the FCA is precluded where payment has not been conditioned upon statutory compliance, and that a contrary result would impermissibly broaden the scope of the FCA, I decline to follow *Aranda*.

The record in the present case falls short of the *Luckey* standard. Mikes has failed to produce any evidence or legal authority indicating that the reimbursements made to Defendants by Medicare for spirometry tests were conditioned upon Defendants' compliance with § 1320c–5. To the contrary, the required certifications included on Form HCFA–1500, the document Defendants submitted for payment, do not include any certification of compliance with regulations concerning conformity to a relevant standard of care. The form requires a health care provider to certify by his or her signature that "the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by [the provider] or were furnished incident to [his or her] professional service by [his or her] employee under [his or her] immediate personal supervision, except as otherwise expressly permitted by [governing] regulations." The provision goes on to state that for services to be considered incident to a physician's professional service, they must be (1) rendered under the physician's immediate supervision by his or her employee; (2) an integral part of the physician's service; and (3) of kinds commonly furnished in physician's offices. Finally, the services of nonphysicians must be included on the physician's bills. (Form HCFA–1500, attached as Exhibit 15 to Relator's Memorandum of Law in Opposition to Summary Judgment.)

It is also noteworthy in this regard that the only sanctions authorized by § 1320c–5 are exclusion from Medicare *after* the Secretary of Health and Human Services agrees with the recommendation of a peer review organization to bar the offending provider from further receipt of benefits, or, at the Secretary's election, fines of up to $10,000 for each unnecessary or improper procedure. *See* § 1320c–5(b)(1), (3). That the only enforcement mechanism of § 1320c–5 consists of post-review punitive measures, rather than a precedent certification requirement, strongly suggests that receipt of payment under Medicare is not conditioned upon compliance with the statute. Rather, the Government has opted to deter Medicare claims for negligently performed procedures through the means of future exclusion from the program or monetary penalties once payment has already been made. Thus, I cannot conclude that compliance with 1320c–5 lay "at the heart of" Defendants' agreement with Medicare. Mikes therefore cannot rely upon the implied certification theory to satisfy the second element of her FCA claim.[3]

■ Nor has this showing been made by her allegation that Defendants committed fraud against the Government by failing to ensure that spirometry tests were per-

---

**3.** Mikes argues that she was unable to adduce further evidence of false claims because her access to the files of patients who she claims underwent improperly performed spirometry tests were located in a "separate location" in Defendants' office that was "not readily accessible" to her. (Affidavit of Patricia Mikes ¶ 31b, attached as Exhibit 6 to Defendants' Notice of Motion.) Apart from the vagueness of this assertion, it is incomprehensible that Mikes would have had no independent recollection of specific patients who received incorrect results or were given improperly administered tests, particularly given that she claims to have observed such results and procedures firsthand. (Affidavit of Patricia Mikes ¶ 32, attached as Exhibit 5 to Relator's Brief.)

formed by trained personnel, resulting in inaccurate data upon which Medicare payments were based. If anything, the evidence suggests the contrary: Form HCFA–1500 permits a certification by the claimant that the procedure was "rendered under the physician's immediate personal supervision" rather than by the physician personally (Mikes Exh. 15), and Mikes has not cited—nor has the Court found—any Medicare provision imposing further requirements with respect to the qualifications of the personnel performing spirometry tests. Moreover, Mikes has produced no evidence to support her allegations that the medical assistants who gave the spirometry tests were not properly trained or supervised. Indeed, Defendants' evidence on this point, also unrefuted by Mikes, indicates that several of the medical assistants employed by PCCA to perform the tests were medical school graduates, some of whom had completed residency and fellowship training, and thus were well qualified to perform spirometry, a relatively uncomplicated procedure. (Affidavit of Gabriel L. Imperato ¶ 26, attached as Exhibit 11 to Defendants' Notice of Motion; Affidavit of Carl B. Sherter, M.D. ¶¶ 20, 21, attached as Exhibit 12 to Defendants' Notice of Motion.) And as with her allegation of false claims based upon improper calibration, Mikes has failed to identify a single inaccurate test result reported to Medicare due to the allegedly substandard qualifications of PCCA's medical assistants. Therefore, Mikes has demonstrated neither a violation of applicable regulations through the administration of spirometry tests by medical assistants that might serve as the basis for an implied false certification claim, nor that any claims made by Defendants were otherwise false

by reason of the assistants' lack of qualifications.

■ Mikes further attempts to establish the falsity of Defendants' spirometry claims by citing the Court to the following statutory and regulatory provisions, all of which expressly require compliance with ATS standards for spirometry: (1) section 902(10) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, which defines "disability" (as covered by the Act) as an "incapacity" determined under "the guides to the evaluation of permanent impairment promulgated … by the American Medical Association," section 5.2 of which recommends the standards of the ATS for spirometry tests; (2) subsection (d)(1)(ii)(B)(1) of 28 C.F.R. § 79.36, which details the requirements for claims by uranium miners pursuant to the Radiation Exposure Compensation Act, 42 U.S.C. § 2210 note; (3) 20 C.F.R. § 718 Appendix B, which governs the determination of total disability or death due to pneumoconiosis of coal miners under the Federal Coal Mine Heath and Safety Act of 1969, as amended, 30 U.S.C. § 901 *et seq.*; and (4) 1993 amendments to Part A of Appendix 1 to Subpart P of 20 C.F.R. § 404, concerning the determination of entitlement to Federal Old–Age, Survivors and Disability Insurance benefits.[4] Mikes argues that the express incorporation of the ATS standards for spirometry into these regulations means that Defendants' failure to comply with those standards in its practice necessarily rendered their claims false under the FCA.

I reject this argument. All of the provisions cited by Mikes, by their very terms, were enacted for the purpose of verifying an individual patient's eligibility for dis-

---

4. Mikes has also cited the Court to 29 C.F.R. Part 1910, a portion of the Occupational Safety and Health Administration (OSHA) regulations defining the standards for determination of occupational exposure to benzene. She has directed the Court to an OSHA summary that accompanied changes the agency made to the regulations in 1987, which make reference to ATS guidelines, but she has neglected to cite a specific portion of the actual regulations that adopt the ATS standards. To the contrary, the references to spirometry in the regulations pertaining to benzene exposure do not specify a governing standard of care. *See* 29 C.F.R. §§ 1910.1001(*l*)(1)(ii)(B), 1910.1028(i)(1)(iii).

ability benefits in highly specific contexts.[5] Payment of those benefits, once awarded, continues for the lifetime of the qualifying beneficiary. The goal of payments under the Medicare scheme, by comparison, is the reimbursement of health care providers for the cost of a single service or procedure—in this case, spirometry tests. This fundamental qualitative distinction between the two classes of regulations very persuasively indicates that the provisions Mikes has brought to the Court's attention are irrelevant to the Medicare reimbursements at issue in this case, and hence, no basis exists for inferring that the Medicare provisions incorporate the ATS standards *sub silentio.*

■ Even if Mikes had been able to demonstrate the falsity of the spirometry claims submitted to Medicare, she cannot establish the third element of her claim, that Defendants submitted Medicare claims with the requisite scienter. A relator is not required to demonstrate specific intent to defraud the Government, *see United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir.1991), but rather, need only establish that the defendant submitted claims with actual knowledge, deliberate ignorance, or reckless disregard of their falsity. *See* § 3729(b)(1)-(3). To this end, Mikes points to (1) her conversation with Straus regarding the need for spirometers to be calibrated, and the subsequent lack of action by the Defendants in response to her advice; (2) the delegation by Defendants of responsibility for spirometry to medical assistants with allegedly inadequate training in violation of their duty

under § 1320c–5; and (3) the fact that the manual for the ST–90 model spirometer used by Defendants described the calibration procedure. Obviously, none of these demonstrates actual knowledge of false claims on the Defendants' part. "The phrase 'known to be false' in [section 3729] does not mean 'scientifically untrue'; it means 'a lie.'" *Wang v. FMC Corp.,* 975 F.2d 1412, 1421 (9th Cir.1992). Mikes therefore must come forth with sufficient evidence that Defendants deliberately ignored or recklessly disregarded the falsity of their Medicare claims. She has not done so.

Significantly, when Congress clarified in 1986 amendments to the FCA that specific intent to defraud would no longer be required to satisfy the scienter element of the Act, it explained that its purpose in lowering that threshold was to impose upon individuals and contractors receiving public funds "some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek," and to "preclude 'ostrich' type situations where an individual has 'buried his head in the sand' and failed to make any inquiry that would have revealed the false claim." *See* S.Rep. No. 99–345 at 20–21, reprinted in 1986 U.S.C.C.A.N. 5266, 5285. Hence, the FCA's mental state provisions were intended to apply to facts markedly different from those on the record in the present case. Mikes has produced no evidence to suggest that Defendants neglected to investigate adequately their entitlement to reimbursement for spirometry tests, or that they remained intentionally ignorant about the legality of their claims. Indeed,

---

**5.** *See Kollias v. D & G Marine Maintenance,* 29 F.3d 67, 74 (2d Cir.1994), *cert. denied,* 513 U.S. 1146, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995) (noting that overriding purpose of Longshore and Harbor Workers' Compensation Act was "to provide consistent workers' compensation coverage to eligible longshore and harbor workers"); 28 C.F.R. § 79.1 (stating that purpose of following regulations is to implement Section 6 of Radiation Exposure Compensation Act authorizing Attorney General to establish procedures for making pay-

ments to qualifying individuals who contracted one of diseases covered under Act); 20 C.F.R. § 718.3(a) (stating that purpose of implementing regulations under Federal Coal Mine Health and Safety Act of 1969, as amended, is to set forth standards for determination of whether coal miner has been disabled, and to specify procedures to be used in medical examinations relevant to such determination); 20 C.F.R. § 404.1501 (noting that scope of subpart includes determination of disability or blindness).

Straus's averment, uncontradicted by Mikes, that he requested further particulars from Mikes as to precisely which spirometry tests were performed improperly indicates the contrary.[6] Her only evidence of reckless disregard consists of her conversation with Straus regarding Defendants' failure to properly calibrate their spirometer and the ensuing risk that test results would be inaccurate.[7] Their discussion, of course, is relevant only to show Straus's awareness of a possible non-conformity with the standard of care as formulated by the ATS. It does nothing to demonstrate knowledge by Defendants that they were submitting claims that were false—as opposed to claims for tests legitimately done but on an improperly calibrated machine—or reckless disregard of such knowledge. And as explained above, a negligent mental state cannot support an action under the FCA.

There is, of course, a reckless disregard of knowledge (or "ostrich") standard under the FCA, and Mikes points out that several courts have determined that this standard may be satisfied where the claimant has reason to believe that his or her claim is based on inaccurate information, but fails to make an investigation as to the veracity of the information conveyed to the Government. *See United States ex rel.*

*Compton v. Midwest Specialties, Inc.,* 142 F.3d 296, 304 (6th Cir.1998) (affirming summary judgment for relator where defendant had not properly tested brake shoes it sold to the Government and thus had a reckless disregard as to the falsity of its claim); *United States v. Krizek,* 111 F.3d 934, 942 (D.C.Cir.1997) (upholding finding of presumptive liability under FCA where defendants submitted Medicare claims with little or no factual basis, without having made any effort to determine the amount of time psychiatrist spent with patients, and psychiatrist failed to review bills submitted on his behalf); *United States v. Raymond & Whitcomb Co.,* 53 F.Supp.2d 436, 447 (S.D.N.Y.1999) (denying summary judgment for defendant where defendant failed to investigate whether mailings qualified for non-profit status). In all of these cases, however, the Government or the relator had made a sufficient showing that there had been a failure to investigate. Here, Mikes has made no such showing. Rather, as discussed above, the evidence demonstrates that Straus sought further information about Mikes's claims of negligently performed spirometry tests by asking her to provide names of specific patients who underwent these tests improperly, which she failed to do.

**6.** Straus averred that after Mikes told him that the spirometers were not being calibrated properly, he "requested that Dr. Mikes review test results to determine whether there was any evidence of an inaccurate result and that she provide guidance to the medical assistants performing the tests to insure [sic] that they were being properly performed and she agreed to do so." Thereafter, Dr. Mikes never advised him "of any evidence of inaccurate test results nor to [his] knowledge did she ever provide any guidance to the medical assistants as to how to properly perform the test." (Straus Aff. ¶ 23.)

**7.** Mikes stated in one of her affidavits: "On or about September 15, 1991, I verbally informed defendant Straus that:

a. the tests as being performed did not conform with the minimum standards set by the ATS;

b. the tests as being currently performed and the failure to provide written interpreta-

tion precluded billing to Medicare for the tests;

c. the improper use of uncalibrated spirometry equipment in derogation of ATS standards would lead to material measurement errors;

. . .

e. the purchase and use of a Syringe was required in order to ensure that the spirometer was properly calibrated so that proper and accurate medical services were provided by the defendants to patients." (Mikes Aff. ¶ 14.)

Straus stated in his affidavit that "[i]n September or October of 1991, Dr. Mikes advised me that she believed the spirometry tests being performed at our offices might be inaccurate because the equipment was not being calibrated properly" (Straus then goes on to state that he asked Mikes to review test results for evidence of inaccuracies and that she failed to do so). (Straus Aff. ¶ 23.)

I further note that there is a split of authority as to whether a relator is required to establish that the Government has suffered damages as a result of the false claim against it. Although the Second Circuit has affirmed a decision stating that damages are a necessary element of a claim under the FCA, *see Blusal Meats, Inc. v. United States*, 638 F.Supp. 824, 827 (S.D.N.Y.1986), *aff'd*, 817 F.2d 1007 (2d Cir.1987), it did not address this issue upon its review. Several other courts, however, have required proof of damages. *See Young–Montenay, Inc. v. United States*, 15 F.3d 1040, 1043 (Fed.Cir.1994); *United States v. Hibbs*, 568 F.2d 347, 350–51 (3d Cir.1977); *United States ex rel. Stinson v. Provident Life & Accident Ins. Co.*, 721 F.Supp. 1247, 1258–59 (S.D.Fla. 1989). Other courts have taken the contrary position. *See United States ex rel. Pogue v. Amer. Healthcorp., Inc.*, 914 F.Supp. 1507, 1509 (M.D.Tenn.1996); *United States v. Kensington Hosp.*, 760 F.Supp. 1120, 1127 (E.D.Pa.1991).

As to damages in the present case, Mikes has provided only an affidavit of a self-titled expert in "data processing and data analysis," who has calculated the amount of Medicare payments for spirometry tests performed at PCCA between 1986 and 1993. (Mikes Exh. 2.) This submission, obviously, does nothing to establish that the Government suffered damages, as opposed to merely having paid for legitimate claims. Thus, if I were confident that the Second Circuit would follow the Federal and Third Circuit rule (which I find to be the more persuasive position), I would grant Defendants' motion for summary judgment on this ground as well. However, it is not necessary for me to predict how the Second Circuit will rule in order to dispose of the complaint, and I decline to do so.

Mikes also alleged in her complaint that Defendants performed spirometry tests unnecessarily. She did not address this claim in her brief. Her attorneys raised the issue at oral argument before this court, but it must be dismissed. Mikes has made absolutely no showing that any spirometry test performed by Defendants was medically unnecessary. This claim is therefore dismissed along with her other FCA claims.

The record is utterly devoid of evidence to support Mikes's conspiracy to defraud claim under § 3729(a)(3). Her supporting papers contain nothing to suggest the existence of a conspiracy among the Defendants, nor does she direct the Court to any such evidence. Accordingly, summary judgment is granted with respect to this claim as well.

Thus, the only remaining claim in this action is Defendants' counterclaim for extortion, which I anticipate to go to trial during the first quarter of 2000. The parties are therefore directed to file with the Court within 10 days of receipt of this memorandum decision and order a revised Pretrial Order dealing solely with the counterclaim.

This constitutes the order and decision of the Court.

### ORDER DENYING RELATOR'S MOTION FOR RECONSIDERATION

 On November 18, 1999, this Court dismissed Relator's claims under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, against her former employers. The facts of this case, with which familiarity is assumed, are discussed in that memorandum decision and order. Relator has moved for reconsideration pursuant to Federal Rule of Civil Procedure 59(e) and Local Rule 6.3.[1] The United States, which had previously declined to appear in this *qui tam* action, has filed a brief as *amicus curiae*, in which it disdains any interest in the resolution of this particular matter, but seeks clarification or reversal of certain findings allegedly made by this Court in its

---

1. Relator's counsel in fact brought this motion under Fed.R.Civ.P. 54(b) (Relator's Br. at 1.). While there is no clear indication of which Rule applies to a motion for reconsideration, courts generally consider a motion for modification of the judgment to be either

decision granting summary judgment to Defendants.

■■■■ To prevail on a motion for reconsideration, the movant must demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See Doe v. New York City Dept. of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.1983). The court's review "is narrow and applies only to already-considered issues; new arguments and issues are not to be considered." *See Morales v. Quintiles Transnational Corp.*, 25 F.Supp.2d 369, 372 (S.D.N.Y.1998). A motion for reconsideration "is not a substitute for appeal and 'may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision.'" *See id.* (citations omitted).

The Relator's motion is denied. Relator does not raise a single new argument or adduce a single additional piece of evidence. Nor does she indicate that the Court has *overlooked* anything in its lengthy opinion disposing of her claims. Rather, Relator argues yet again the same points she pressed (with little or no evidentiary support, despite the posture of the case) in opposition to the original motion. Relator thinks I am wrong. I think I am right. The Second Circuit will no doubt have the last word on the subject. But this busy Court hardly needs to redo work it has already done just because the losing party is dissatisfied with the result.

The United States approaches the Court far too late in the day for me to give its papers serious consideration. This action is over seven years old. The Government has repeatedly declined to intervene and take over the prosecution. When the case was reassigned to me last summer, I invited the Government to make a final decision by a date certain—*before* I undertook the arduous task of familiarizing myself with an extensive record and disposing of the pending summary judgment motion. The Government declined to do so. If it had something to say to me on a subject it obviously considers to be of some importance (even though it has no interest in Relator's particular situation), it should have accepted my earlier invitation. The Court would have welcomed the Government's expertise and guidance at that point. I cannot say I am happy to have it now.

The amicus brief (which, presumptuously, was not even accompanied by an application for leave to present it) asserts that the Court misapprehended two points. After reading it, and re-reading my decision of November 18, I am persuaded that it is the Government that misapprehends the import of the Court's decision.

First, the Government seems to be under the misimpression that this Court ruled that the "false implied certification" doctrine precluded False Claims Act cases for Medicare items and services "not reasonably necessary" for the treatment of illness or injury. (Amicus Br. at 6.) This Court articulated no such ruling. Relator did contend in her pleading that Defendants submitted Medicare reimbursement claims for unnecessary testing, but she failed to substantiate that charge with so much as a scintilla of evidence—a fact I

a Rule 59(e) motion to alter or amend the judgment, or a Rule 60(b) motion for relief from a judgment or order. *See Retarded Citizens of Connecticut, Inc. v. Thorne*, 68 F.3d 547, 553 (2d Cir.1995). Rule 54(b), by contrast, empowers a district court to enter final judgment on one or more but less than all claims in a suit, or as to one or more but less than all the parties in the action. The purpose of Rule 54(b) is "to avoid the possible injustice of a delay in entering judgment on a distinctly separate claim or as to fewer than all of the parties until the final adjudication of the entire case by making an immediate appeal available." *See Nat'l Asbestos Workers' Medical Fund v. Philip Morris, Inc.*,71 F.Supp.2d 139 Nos. 98 CV 1492, 98 CV 3287, 97 CV 7658, 1999 WL 1000144, *12 (E.D.N.Y. Nov.1, 1999) (quoting 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2654). The invocation of Rule 54(b) on the present motion thus seems rather perplexing, given that no claims or parties remained in this action after I granted summary judgment against Relator.

certainly did not "overlook" or "misapprehend" in my ruling.

The Government then cites me to *Goodman v. Sullivan*, 891 F.2d 449, 450 (2d Cir.1989), in which that Court noted that the Secretary of Health and Human Services has interpreted the phrase "reasonable and necessary" to preclude coverage for "unproven treatments or diagnostic methods not generally accepted by the medical profession." (Amicus Br. at 7.) No such issue was presented in this case. Relator did not contend that spirometry was an unproven treatment or a diagnostic method not generally accepted by the medical profession. She contended that Defendants did not calibrate their spirometers properly, in accordance with a particular medical society's recommendations, which she claimed was the appropriate standard of care in the profession. That is an entirely different question, and one that falls far outside the ambit of the False Claims Act, as the Seventh Circuit held in *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730 (7th Cir.1999). The Government is correct when it states, "Neither the [Medicare] statute, regulations or the Manual purport to specify how all recognized medical procedures deemed compensable under Medicare Part B are to be performed." (Amicus Br. at 7.) It is precisely because the Secretary does not tell doctors how to perform procedures that a *qui tam* action brought under the False Claims Act is a particularly ill-suited vehicle for deciding how they ought to be performed.[2]

Whether medical providers are required to certify compliance with Medicare each time they file or just the first time they file is beside the point. The point, which the Government apparently misapprehends, is that the certifications in this case—including any pre-certification made as part of Defendants' original Health Care Provider/Supplier Application (the text of which is set out in Amicus Br. at 10)—did not,

either explicitly or implicitly, suggest that the spirometry machines used to measure patients' lung function had been calibrated in accordance with standards that the Government has neither promulgated nor adopted in any statute, regulations or manual governing Medicare. I have no reason to reconsider my conclusion in this regard, and do not see it as any threat to the Government's ability to use the False Claims Act to root out legitimate fraud.

Finally, the Government urges this Court to reconsider its finding that the existence of the anti-fraud remedy specified in § 1320c–5(b)(1) and (3) of the Social Security Act preempts the False Claims Act and precludes FCA liability. I made no such finding. Rather, I found that the existence of the Medicare statute's anti-fraud remedy supported my conclusion (reached on other grounds) that compliance with § 1320c–5 did not "lay 'at the heart of' Defendants' agreement with Medicare" (Decision and Order at 9)—which, per *Luckey*, I held to be the standard for imposition of False Claims Act liability in an implied false certification case. Had I found that compliance with § 1320c–5 did lie "at the heart of" the agreement between Medicare and Defendants, and that Defendants had impliedly certified that the machines in their office met standards that the Government concedes the Secretary has not explicitly imposed on providers, then there could of course be liability under both the Medicare anti-fraud provision and the False Claims Act. Likewise, if I had determined that this was not an implied false certification case at all, but rather one in which Defendants had made an *explicit* false certification, Defendants might have been liable under both statutes. But those are not our facts.

I suspect that the reason the Government chose not to intervene in this matter is its recognition that Relator's allegations (independent of her lack of evidence to

---

2. By contrast, the Small Business Administration *does* tell participants in its minority-owned business program how to run their operations. *See Ab–Tech Construction, Inc. v.*

*United States*, 31 Fed. Cl. 429, 434 (1994), *aff'd*, 57 F.3d 1084 (Fed.Cir.1995). The FCA may be invoked under the implied false certification doctrine in that circumstance.

prove them and the context in which they arose) were a "stretch" under the False Claims Act—a suspicion that is all but confirmed by the Government's repeated disclaimer of any interest in the outcome of this specific *qui tam* action. While this Court believes that its opinion was compelled on the facts of this case and the spotty record with which I was presented, I cannot promise that others will not interpret my words in a manner more sweeping than the Government would like. The Government's protection against such a result, however, was to assist in the crafting of the opinion in the first place, not to step in and try to obtain changes wholly independent of the merits of this particular case. This Court does not sit to prepare advisory opinions that the Government can use in cases in which it *does* take an interest.

This constitutes the decision and order of the Court.