UNITED STATES of America,
Plaintiff,

v.

NHC HEALTHCARE CORP. d/b/a
NHC Healthcare Center of Joplin,
NHC/OP LP, Defendant.

No. 00–3128–CV–S–4–ECF.

United States District Court,
W.D. Missouri,
Southern Division.

Aug. 30, 2000.

Stephen L. Hill, Jr., U.S. Atty., Andrew J. Lay, Asst. U.S. Atty., for U.S.

John F. Cowling, Lynn W. Hursh, Thomas M. Bradshaw, Armstrong Teasdale, LLP, St. Louis, MO, for NHC Healthcare.

## ORDER

FENNER, District Judge.

Presently before the Court is the Defendant, NHC Healthcare Corporation ("NHC")'s Motion to Dismiss the Complaint filed by the Plaintiff, the United States of America ("United States" or "Government"). This cases arises out of alleged Medicaid and Medicare fraud perpetrated by the Defendant. For the reasons set forth below, the Defendant' Motion is hereby GRANTED in part and DENIED in part.

## DISCUSSION

### I. Standards for a Motion to Dismiss

A motion to dismiss is the proper method to test the legal sufficiency of a complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Federal Rule of Civil Procedure 12(b) states that a party may move for dismissal of all or part of the claims against it if the allegations, taken as true, fail to state a claim for which relief can be Granted. Dismissal under the rule "is inappropriate unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McCormack v. Citibank, N.A.,* 979 F.2d 643, 646 (8th Cir.1992) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). When considering a motion to dismiss, an assumption must be made that all factual allegations are true and a dismissal may be Granted "only if it is clear that no relief can be Granted under any set of facts that could be proved consistent with the allegations." *Alexander v. Peffer,* 993 F.2d 1348, 1349 (8th Cir.1993).

## II. Facts

The Defendant is a nursing home and skilled nursing facility operating in the Joplin, Missouri area. The facility is licensed in the state of Missouri and is a certified participant in the Medicare and Medicaid programs. Essentially the Government argues in this case that the Defendant had such woefully low staff numbers at its facility that it could not possibly have rendered all the care that it billed the Medicare and Medicaid programs. Specifically, the Government presents evidence as to two unnamed residents who it alleges were inadequately cared for by the Defendant. The Government claims that these residents developed pressure sores, incurred unusual weight loss, were in unnecessary pain, were generally not given care up to the standards required under the Medicare and Medicaid programs, and ultimately died because of this care. The Government claims that these two residents were given this inadequate care because the Defendant knowingly maintained inadequate staffing at its facility. The Government further claims that because the Defendant knew of these staff shortages and knew that it was not providing the necessary care to these two patients it was submitting false and fraudulent claims to the Medicare and Medicaid programs. The Government alleges damages under the False Claims Act ("FCA"), payment by mistake of fact, common law fraud, and breach of contract. The Government also requests a declaratory judgment from the Court declaring that the Defendant engaged in the activities which it alleges.

## III. Analysis

### A. Rule 9(a); Pleading Fraud With Particularity

■ The Defendant first argues that the Plaintiff has not met the standards for pleading fraud with particularity as required by Rule 9(b) of the Fed.R.Civ.P. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Eighth Circuit has explained that the "circumstances" as the term is used in Rule 9(b), "include such matters as the time, place and contents of the false representation, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982). Rule 9(b) is designed in part to "facilitate a defendant's ability to respond and to prepare a defense to charges of fraud." *Commercial Property Inv., Inc. v. Quality Inns Int'l, Inc.*, 61 F.3d 639, 644 (8th Cir.1995). Thus, "conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." *Id.*

■ The Court has carefully reviewed the Plaintiff's Complaint and concluded that it does meet the standards of pleading with particularity as set forth in Rule 9(b). The Complaint sets forth sufficient details about the alleged fraudulent activities instigated by the Defendant so as to allow the Defendant to adequately prepare its defense. Indeed, the Defendant has mounted a vigorous defense thus far in this case it does not appear to be hampered by a lack of specific allegations. The United States has alleged the general time frame when the neglect and overbilling occurred. When an underlying fraudulent activity is alleged to have occurred systematically and continuously over a period of time it is sufficient to allege a general time frame of the fraud in question. *United States ex rel. Pogue v. American Healthcorp., Inc.*, 977 F.Supp. 1329, 1333 (M.D.Tenn.1997). During this 2–3 month time period when the neglect occurred and was billed the Government has also alleged which patients were involved and what specific neglect occurred to them. Furthermore, the Government alleges and provides exhibits supporting a theory that NHC was severely understaffed which caused the neglect in question. Finally, the United States has also alleged the specific claims for payment which it believes were fraudulently paid.

■ The Defendant complains that many details are left out of the Complaint such as what specific services were not provided. However, this type of more specific information is likely not in the posses-

sion of the Plaintiff at this time and is more properly brought to light in discovery. *See United States ex rel. Mikes v. Straus*, 853 F.Supp. 115, 119 (S.D.N.Y. 1994) (holding that the plaintiff is not required to provide information at the complaint stage which is not available to him). Rule 9(b) was meant to require detailed pleadings in cases of fraud so as to aid a defendant in supporting its case. It was never meant to require a plaintiff to set forth every factual detail supporting its claim, nor was it meant to fuse the stages of pretrial investigation and discovery. Taken as a whole, the Court finds that the Complaint alleges facts with sufficient particularity so as to meet the demands of Rule 9(b).

## B. The Propriety of Utilizing the FCA in the Health Care Setting

While the Government certainly has expressed an interest in cracking down on fraud in the health care industry, the purpose of this suit also implies regulation and compliance. Utilizing the FCA and other similar common law causes of action as a tool to force care facilities into providing better quality care is a fairly recent phenomenon. Although extensive regulatory authority exists for punishing unscrupulous facilities, the Government has increasingly opted for the expedited results of lawsuits under the FCA's powerful threats of significant fines, treble damages, and costly litigation fees. The health care industry has vigorously resisted this movement by the Justice Department on a variety of fronts, not the least of which is that the FCA was never intended to be a regulatory tool. Because this is an emerging area of law there are few guidelines for this Court to follow.[1] Until this issue works its way through the appellate system it will remain unclear whether the Government's movement towards in-

creased scrutiny of care facilities through FCA lawsuits is a bona fide exercise of prosecutorial resources or an improper expansion of this powerful Act. This is a case of first impression in this district and apparently in the Eighth Circuit as a whole.

At the outset, the Court notes that the parties and many of the articles and cases which the Court has read in the course of its research have discussed the policy considerations of the Government's recent trend of utilizing the FCA as a check on health care providers. While at certain times a court is required to consider policy questions, it is generally the function of the courts to interpret the law as written. In this case there may be broad negative implications for the health care industry by the continued prosecution of providers under the FCA. But it is not the place of this Court to exempt an entire industry from FCA liability simply because it may be hurt by such suits. If the claims submitted by the Government comport with the requirements of claims submitted under the FCA, then the suit is proper. If this outcome is unsavory to the Defendant or its industry as a whole then the change is to made in the political arena via Congress or the Executive Branch. This Court will interpret the plain meaning and logical interpretation of the FCA as it applies to this case, and not entertain wide speculation as to the effect of any particular decision.

### 1. Establishing a Claim under the FCA

 In order to establish a claim under the FCA the Plaintiff is required to establish: (1) that NHC submitted a claim for payment to the federal government; (2) the claim was false or fraudulent; and (3) NHC submitted the claim "knowing" that it was false.[2] *United States v. Straus,*

---

1. For background and discussion of this emerging area of law *see* Robert Fabrikant and Glenn E. Solomon, *Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry*, 51 Ala.L.Rev. 105 (1999); John R. Munich and Elizabeth W. Lane, *When Neglect Becomes Fraud: Quality of Care and False Claims*, 43 St. Louis U.L.J. 27 (1999); and Adam G. Snyder, *The False Claims Act Applied to*

*Health Care Institutions: Gearing Up for Corporate Compliance*, 1 Depaul J. Health Care L. 1 (1996).

2. There is a split in authority as to whether a fourth element, damages, is required. Because the issue has not been raised by the parties the Court need not address it at this time.

84 F.Supp.2d 427 (S.D.N.Y.1999). The Defendant concedes that it made a claim for payment to the Federal Government, but it disputes that the second and third elements have been satisfied. As to the third element, the knowledge requirement under the FCA can be satisfied by actual knowledge, by acting with deliberate indifference to the truth or falsity of the information submitted, or by acting in reckless disregard of the information. 31 U.S.C. § 3729(b); *see also United States v. Krizek,* 111 F.3d 934, 941–42 (D.C.Cir.1997). The purpose of this particular definition of "knowing" was to avoid the claimants who bury their heads in the sand and purposefully submit in ignorance a false claim. Because of the lack of scienter required under the FCA the Court finds that for purposes of this Motion to Dismiss the Plaintiff has sufficiently plead the third element of knowingly submitting a claim.

Therefore, the Court is left with the issue of whether any factual scenario reasonably supported by the allegations in the Complaint can support the claim that the Defendant submitted a false or fraudulent claim. Proving that one of the claims set forth in the Complaint is false or fraudulent is a difficult proposition because these claims were necessarily based on somewhat subject regulations, rules and laws pertaining to proper health care maintenance. Certainly if the Defendant billed the United States for specific services that it never rendered then that claim would be fraudulent and properly actionable under the FCA. To the extent that the Government alleges this theory it is clearly a cognizable theory. At the other end of the spectrum the Court would not find a cognizable claim under the FCA if the United States simply disagreed with a reasonable medical or care treatment administered by the Defendant. In that case, the Defendant would obviously be innocent of fraud in its billing practices, but rather it would simply be at odds with the entity that pays the treatment it provided. *See* Constantinos I. Miskis v. William F. Sutton, Jr., *Enforcing Quality Standards in Long–Term Care: The False Claims Act and Other Remedies,* 73 Fla. B.J. 108, 110 (June 1999) (arguing that liability under the FCA for submitting false claims should lie somewhere between gross neglect and perfect care). Unfortunately this case, as with almost all difficult legal judgments, falls somewhere between these clear examples.

The main thrust of the argument from the Government is not that the Defendant completely failed to treat the two residents in question. Rather, the Government argues that NHC was so severely understaffed that it could not possibly have administered all of the care it was obligated to perform under the Medicare and Medicaid programs. If the Defendant billed Medicare and Medicaid for each individual act of care (i.e. turning, cleaning, administering drugs, food care, etc.) then this case would be relatively straightforward; the Court could simply compare what items NHC billed the United States for and what acts were actually performed. Unfortunately again, this is not the billing procedure. Medicaid and Medicare pay the Defendant a "per diem" payment for caring for each of the residents in the programs. This per diem payment is meant to cover the expenses of all necessary treatment given to each patient. In exchange for this per diem payment the care facility agrees in principle to "care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life." 42 U.S.C. § 1396r(b) (quotation from Nursing Home Reform Act which all Medicare and Medicaid recipients are required to adhere to). Therefore, the Court holds that in order for the Plaintiff to prove that it was fraudulently billed for the care given to the two residents at issue in this lawsuit it must demonstrate that the patients were not provided the quality of care which promotes the maintenance and the enhancement of the quality of life.

Obviously, this is an amorphous standard in need of further clarification. However, at this stage in the litigation the

Plaintiff need not support the allegations in the record, it need only plead a sufficient cause of action. The Court cannot say as a matter of law that no set of facts which could be reasonably demonstrated by the Government could not result in FCA liability. It may indeed be a very difficult burden of proof for the Government to show that the Defendant did not provide the minimum level of care necessary under its obligation to the United States, but difficulty in proving a cause of action should not bar the cause from even being litigated. *See United States ex rel Aranda v. Community Psychiatric Centers of Oklahoma, Inc.,* 945 F.Supp. 1485 (W.D.Oklahoma 1996) ("a problem of measurement should not pose a bar to pursuing an FCA claim against a provider of substandard health care services under appropriate circumstances.").

### 2. Case Law

As stated above this is a relatively new area of the law with little case law guidance. Several scholars have also offered opinions in this area and to the extent that their opinions are relevant and helpful they will be discussed herein. The parties cite to two district court opinions with differing results. The Court will examine both cases in depth.

#### a. *Straus*

In *United States ex rel Mikes v. Straus,* 84 F.Supp.2d 427 (S.D.N.Y.1999), a qui tam action was brought by a former employee of the defendant medical laboratory. This employee alleged that the defendant violated the FCA by submitting medicare payments for spirometry tests which did not meet the standard of care. She alleges that the defendant knew that the machinery was not calibrated correctly and yet conducted and billed for the tests anyway. *Id.* at 430. The defendant filed a motion for summary judgment which the court granted. *Id.* at 427. The court held that submitting a claim to the Government for services not performed to the relevant standard of care, without more, did not render the claim fraudulent for FCA purposes. *Id.* at 433. The court also rejected the plaintiff's theory that the defendant had impliedly certified that it would comply with the standard of care, thus making the claim fraudulent.[3] The court seemed to hold that if the defendant had expressly certified that it would comply with the relevant standard of care as a condition of receiving payment, then a claim for fraudulent submission under the FCA may have been cognizable if such standard were knowingly breached. *Id.* at 436. The court also found a narrow application of implied certification in the health care arena. The court found that only in rare circumstances when statutory compliance lies at the core of the agreement between the claimant and the Government can a FCA action be maintained for implied certification of compliance with statutes. The court examined several other cases analyzing implied certification and summarized its position by stating,

> implied false certification is to be found only in those exceptional circumstances where the claimant's adherence to the relevant statutory or regulatory mandates lies at the core of its agreement

**3.** The literature in this area of law regularly discusses the issue of "implied certification." Implied certification theory essentially means that the Government (or qui tam relator) alleges liability based on the proposition that the provider has implicitly certified in its claims for reimbursement that it has provided care in a manner consistent with the prevailing standard of care. Usually this implied certification comes from a separate compliance document signed by the provider indicating that it will comply with all Medicare and Medicaid regulations and standards of care in order to be eligible for participation. *See Application of the Federal False Claims Act to Regulatory Compliance Issues in the Health Care Industry,* 51 Ala.L.Rev. 105, 148 (1999) (criticizing this theory as applied in the health care arena).

The parties to this case disagree as to the applicability of the implied certification theory under the FCA. The Defendant vigorously maintains that this concept is what the Government is essentially utilizing to show liability under the Act, while the Government maintains that this theory has no bearing.

with the Government, or, in more practical terms, where the Government would have refused to pay had it been aware of the claimant's non compliance. *Id.* at 435. The court found that this narrow application had not been met in the case before it and summary judgment was appropriate.

This Court finds the present case factually distinguishable from, yet legally supported by, the *Straus* decision. First, the case is factually distinguishable in that the posture of that case was of summary judgment which means that the judge presiding over that decision had the flexibility to examine the evidence presented and more clearly envision the scope of the case brought by the plaintiff. This Court does not have that luxury and must assume all well-plead facts as true and grant every reasonable inference to be drawn from the pleadings to the Government.

Second, the facts of the *Straus* case do not closely resemble the facts at present. The procedure at issue in *Straus* was a spirometer test utilized to measure the pulmonary function of certain Medicare patients. The billable dispute did not relate to whether the tests were being performed, but rather whether the manner in which they were administered met the relevant standard of care. The qui tam relator alleged that the tests were being performed by untrained medical assistants utilizing uncalibrated machines. *Id.* at 431. The court rightfully held that this dispute as to the proper standard of care for these billed procedures did not rise to the level of a fraudulent claim under the FCA.[4] *Id.* at 442. In this case, the Court is presented with a factual scenario in which the Government alleges that certain care procedures were not performed at all. Essentially, the Government argues that it paid the Defendant for complete care of these elderly patients (the standard of

care) and the Defendant failed to meet this standard by knowingly failing to perform all necessary acts. This is not a question of technical compliance with regulations and care standards, it is a question of performing all functions that were actually billed for. Furthermore, complete care, as set forth in the regulations, was "at the heart" of the agreement between the Government and the Defendants. Unlike technical shortcomings in tests administered to Medicare patients in the *Straus* case, the Government has alleged that the Defendant has wholly failed to properly care for these two residents.

At the heart of the agreement in the present case is the overall promotion and maintenance of the quality of life of these two residents. As set forth in *Straus*, a health care provider can be held to have impliedly certified that it will comply with the relevant standard of care as set forth in the regulations and statutes if that standard of care lies at the core of the parties' agreement. This is exactly what occurred here. The billing dispute at issue here is not **how** the Defendant turned, bathed, administered drugs to, and fed the two residents in question, but **whether** the Defendant did these things at all. This latter question is different than the issue facing the *Straus* court and in this Court's view represents the core of agreement between the parties. Unlike performing medical tests, when caring for the infirmed it is not the end product result that it crucial, it is the dignity and quality of life provided through the care process. The Government has alleged that this essential agreement was grossly violated and the Court finds that for purposes of a motion to dismiss, this allegation satisfies the requirements under the FCA. This conclusion is consistent with the wording, if not the spirit of *Straus*.

4. While the standard of care is raised in *Straus* and the present case, it is discussed for differing reasons. In *Straus*, the Plaintiff alleges that the mere violation of the standard of care, followed by billing Medicare for the defective procedures, was a violation. Conversely, in this case the Government utilizes the standard of care as a measuring stick to demonstrate that not all necessary medical acts that were billed for were actually performed.

### b. *Aranda*

The second case, cited by Plaintiff, is almost factually indistinguishable from the present case. In *United States ex rel Aranda v. Community Psychiatric Centers of Oklahoma, Inc.*, 945 F.Supp. 1485 (W.D.Oklahoma 1996), the Government brought a FCA action on behalf of a psychiatric patient being cared for by the defendant. The Government alleged that the defendant knowingly failed to provide a reasonably safe, secure and quality environment for its residents and yet impliedly certified that it would do so. *Id.* at 1487. This implied certification arose from the defendant submitting bills to Medicare when it had previously agreed to abide by all statutes, rules, and regulations required under the Medicare programs. *Id.* The court agreed that for purposes of a motion to dismiss the defendant had impliedly agreed to comply with all statutes, rules and regulations under the Medicare program. *Id.* at 1488. Further, the court agreed that by submitting bills for procedures that were not performed to the standard of care, the defendant had opened itself to liability under the FCA. The complaint alleged that patients at the defendant's facility were subjected to unreasonable risks of physical, emotional, and sexual harm which were known to the defendant and were so blatantly unreasonable that it was improper to bill Medicare for the treatment. *Id.* at 1488–89. The court held that these allegations stated a cause of action. *Id.*

The Court finds that *Aranda* case supportive and sufficiently analogous to the case at bar. The care provided to inpatient psychiatric residents is very similar to the controlled environment of a nursing home. As with the *Aranda* case, the Government is alleging that the Defendant failed to adhere to the relevant standard of care set forth in statutes, regulations and rules and, therefore, billed the United States for care it did not actually perform. Knowingly submitting claims against the United States for Medicare and Medicaid services not actually performed clearly violates the FCA. The *Aranda* case fully supports this Court's holding.

### C. Other Causes of Action

 In Counts II, III, and IV, the Government has alleged theories of mistake of fact in making payment, common law fraud, and breach of contract respectively. After reviewing the pleadings the Court has determined that all of these Counts state a cause of action. In Count II the Government alleges that it would not have paid the Defendant had it not been under the mistaken impression that it was providing all the care that it was supposed to. This pleading satisfies the federal systems notice pleading requirements as well as the requirements under Missouri common law. Count III alleges common law fraud which, similar to the FCA claim, has been plead with the requisite particularity and with the elements necessary to state a claim under Missouri law. Finally, in Count IV the Government has alleged the existence of a contract between itself and the Defendant and alleged that the Defendant materially breached the contract by providing substandard care. These allegations satisfy the requirements of sufficient pleading.

### D. Declaratory Judgment

 In Count V the Government requests that this Court grant a declaratory judgment stating that the Defendant knowingly submitted false claims to Medicare and Medicaid as a part of a continuous pattern of wrongdoing. A declaratory judgment is a judicial tool allowing courts to fashion coercive remedies for parties whose controversies have yet to ripen, yet threaten to imminently do so. *See* 10B Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure Civil 3d* § 2751 (1998). It is designed to relieve parties of the threat of impending litigation by declaring the rights of the parties prior to any accrual of actual loss. *Id.* However, even under a declaratory judgment, a Court must be presented with an

actual case or controversy. *Vorbeck v. Schnicker,* 660 F.2d 1260, 1265 (8th Cir. 1981). Advisory opinions are not permitted even under the auspices of Rule 57 or the Declaratory Judgment Act.

In this case, it is the Court's assessment that the Government requests little more than an advisory opinion. It simply seeks a separate judicial pronouncement that the Defendant engaged in the wrongful acts which the United States alleges. The Government's stated purpose for using this pronouncement is as a means of removing NHC from the Medicare and Medicaid programs. The Court fails to see how any justiciable case or controversy is presented or how the Government is faced with the immediate need for a judicial declaration. By declaring that NHC engaged in wrongful acts the Court would provide nothing but an advisory opinion for the Government to utilize in its efforts to remove NHC from its subsidized health programs. The declaration itself would resolve no dispute between the parties, rather, it would simply facilitate the Government's efforts to win the real case or controversy; removing NHC from Medicare and Medicaid participation. The Court does not believe this is the proper province of the federal courts.

In the alternative, it is well settled that the decision to entertain and grant a declaratory judgment is within the sound discretion of the district court. *Wilton v. Seven Falls Co.,* 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995). The Court does not believe that a declaratory judgment is proper in this context and further the Court finds that it is not truly necessary. The Court refuses to exercise its discretion in this case because the requested relief in Count V is simply inappropriate.

### CONCLUSION

For the reasons set forth below the Court hereby finds that the Government has sufficiently plead causes of action as to Counts I–IV. The Court further finds that the Government has failed to establish the need for a declaratory judgment and the Court DISMISSES Count V. The Defendant's Motion to Dismiss is hereby DENIED in part and GRANTED in part.

**IT IS SO ORDERED.**