UNITED STATES of America,
Plaintiff,

v.

NHC HEALTH CARE CORP, d/b/a
NHC Health Care Center of Joplin, NHC/OP LP, Defendants.

No. 00–3128–CV–S–4–ECF.

United States District Court,
W.D. Missouri,
Southern Division.

July 17, 2001.

### ORDER

FENNER, District Judge.

Presently before the Court is the Defendants NHC Health Care Corporation, NHC/OP LP ("NHC")'s Motion for Summary Judgment. This Motion is opposed by the Plaintiff United States of America ("United States" or "Government"). This case arises out of alleged Medicare and Medicaid fraud perpetrated by the Defendants. For the reasons set forth below, Defendants' Motion is GRANTED in part and DENIED in part.

### DISCUSSION

#### I. Standard

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 727–28 (8th Cir.1979).

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the absence of genuine issues of material fact. However, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in the pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment stage the judge's function is not to weigh the credibility of the evidence, but rather to determine whether a genuine issue of material fact exists. *Id* at 249, 106 S.Ct. 2505. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* at 249, 106 S.Ct. 2505. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted).

## II. Background

Defendants operate a long-term care facility located in Joplin, Missouri. This suit was brought by the Government against the Defendants under the False Claims Act ("FCA") (Count I), common law mistake of fact (Count II), common law fraud (Count III), breach of contract (Count IV), and unjust enrichment (Count V). The Government alleges that the Defendants, participants in the Medicare/Medicaid programs, submitted false or fraudulent bills to the United States in violation of the FCA. More specifically, the Government alleges that the care of two particular residents (hereinafter "Residents 1 and 2") during the Summer and Fall of 1998 was

so insufficient and negligent that the claims for reimbursement amounted to fraud.

### A. Resident 1

Resident 1 was admitted to the Defendants' facility on June 5, 1998, following a transfer from Freeman Hospital. Resident 1 suffered from numerous medical difficulties. While at NHC, Resident 1 suffered dehydration and digitoxicity. The Defendants claim that these conditions were caused by treatment for a heart condition while the Plaintiff presents evidence that the conditions were caused by NHC's negligent care. Resident 1 also suffered severe back pain and the parties present differing evidence as to whether NHC properly managed this condition. Resident 1 further lost weight while at NHC and the parties present differing evidence of whether that weight loss was due to Resident 1's medical condition or NHC's lack of proper care.

At the time of transfer Resident 1 had two pressure sores including a stage II sore on his coccyx. NHC attempted to treat these sores and they admit to having only "limited success." NHC used a vacuum device to treat the sores, but the record reflects that the device was not utilized properly at times and did not cure the pressure sores. The record also reveals that both pressure sores worsened while Resident 1 was under NHC's care. Eventually, Resident 1 was transferred to a hospital for treatment of these wounds and the staff at the hospital was successful in improving the conditions of the two wounds. Subsequently, Resident 1 was transferred to another care facility where he continued to have problems with pressure sores. He eventually died on October 19, 1998.

In September 1998, Missouri Division of Aging ("Division") surveyor Barbara Holden interviewed Resident 1 as a part of the Division's evaluation of NHC's care. Resident 1 complained about the NHC staff's failure to assist him in using the restroom. At the time of the interview, Resident 1's sheets were stained and filthy with feces. Resident 1 complained of only being bathed once every five days or so and of smelling "bad." Resident 1 also complained that his pressure sores were getting worse while under NHC's care. Resident 1 further complained that the NHC staff did not properly assist him while he was eating, nor did they assist him in positioning himself in and out of his bed. Karen Smith, Resident 1's daughter, visited Resident 1 almost daily for about one hour. She complained that the NHC staff did not attend to her father nor provide him the care he needed. She also complained as to the conditions at NHC and its insufficient staff.

### B. Resident 2

Resident 2 entered NHC's facility as a resident on June 23, 1998, with four established pressure sores. NHC was fairly successful in treating these sores although Resident 2's conditions made her susceptible to continued outbreaks of pressure sores. She did in fact develop new pressure sores while at NHC, but the cause of these ulcerations is disputed by the parties. Resident 2 was blind, anemic, bedridden, and suffered from cardiac and gastric disorders. Resident 2 experienced significant weight loss while a resident at NHC. Defendants present evidence that this weight loss was due to her physical ailment while Plaintiff presents evidence that the weight loss was due to NHC's lack of proper dietary care. Resident 2 died at NHC on November 6, 1998.

Division surveyor Deborah Hancik interviewed Resident 2 in September 1998. Hancik noted that at the time of the interview Resident 2 smelled "real foul." Han-

cik also noted that Resident 2 was not clean, had a dirty catheter, and that she complained of feeling itchy, not being provided with clean clothes, and of feeling dirty. Resident 2 also complained that her food choices were not being honored and that the staff at NHC continually brought her food which she did not like. She also complained that the food was cold.

### C. Other Evidence of the Care Provided Residents 1 and 2

NHC experienced significant staffing shortages during the relevant time periods of this lawsuit partially due to low wages. The parties have produced several documents from NHC officials to their home office requesting additional funding for nursing care so that they might better hire and retain staff. These letters expressed some level of concern over the current staffing shortages occurring during the Spring of 1998. In addition, several NHC staff members resigned in 1998 citing ethical, legal, and workload concerns revolving around the continued staffing woes experienced at NHC. Many family members also complained to the Division and to NHC officials concerning NHC's lack of sufficient staff. In response to these complaints and to the survey conducted by the Division, NHC significantly increased its nursing staff beginning in late 1998.

The Division received numerous "hotline" complaints from family of residents at NHC concerning the lack of proper care given at the facility. Family members also demanded a meeting with Division surveyor Larry McGee in which they complained about the residents not being assisted to

eat, not being kept clean and dry, and the overall smell of the facility. A second Division surveyor, Ann Luce, observed in September of 1998 several incidents of sub-standard care including wet residents, residents in their beds with no sheets and no bed clothes, and food trays out of the reach of disabled residents. Surveyor Barbara Holden reported problems with resident's call lights not being answered, staff failing to respond to residents request for assistance in going to the bathroom, uneaten food on trays in the hallways, and a putrid and strong smell throughout the facility.

### III. Analysis

#### A. FCA Claim

■ The first claim brought by the Government against NHC is under the FCA. As previously established in this Court's Order denying Defendants' Motion to Dismiss, in order to state a cause of action under the FCA, Plaintiff must establish three essential elements: (1) that NHC submitted claims for payment to the Medicare and Medicaid programs; (2) the claims were false or fraudulent; and (3) NHC knew that the claims were false, or acted with reckless or deliberate disregard for the truth. *United States v. NHC Healthcare Corp.*, 115 F.Supp.2d 1149, 1152–53 (W.D.Mo.2000) (citing *United States v. Straus*, 84 F.Supp.2d 427 (S.D.N.Y.1999)).[1] Defendants first argue that Plaintiff's claims are barred by the concept of implied certification. Defendants next claim that Plaintiff has failed to create a genuine issue of material fact as to elements (2) and (3).[2]

---

1. As addressed in the Court's previous Order, there remains a split in authority as to whether a fourth element, damages, is also required. Neither side has raised this issue and so the Court will not discuss it herein.

2. Defendants also argue that no issue of fact remains as to whether the representations

made in the reimbursement claims were material, and thus, they are entitled to summary judgment on that basis. The Court has previously ruled in Plaintiff's Motion for Partial Summary Judgment that an issue of fact remains as to whether Defendants' statements were material. Accordingly, the Court will not address this issue again here.

## 1. Implied Certification

At the outset, the Defendants again argue that the theory of "implied certification" should somehow bar the Government's action in this case. The Court has previously ruled that this concept is only marginally germane to the present case, however, Defendants request that the Court reconsider this view. Implied certification essentially means that the Government alleges liability based on the proposition that a healthcare provider implicitly certified in its claim for reimbursement that it would adhere to the prevailing standard of care when providing services to its Medicare and Medicaid residents. Defendants argue that the majority of courts have rejected this theory in healthcare cases. Defendants further argue that the Court has erroneously adopted an implied certification standard when assessing liability against NHC. Plaintiff counters that it is not seeking liability against the Defendants under a theory of implied certification and if anything, Defendants expressly certified compliance with the standard of care.

█ In advancing this theory (again), Defendants fail to understand the nature of the claims brought against them or this Court's previous holdings. To begin with, the Court did not expressly endorse implied certification in this case in its Order Denying Defendants' Motion to Dismiss. The Court merely noted that even cases that have rejected implied certification in the healthcare arena have carved out exceptions under factual circumstances such as the present one. *See NHC*, 115 F.Supp.2d at 1155. For instance, the court in *United States ex rel Mikes v. Straus*, 84 F.Supp.2d 427, 435 (S.D.N.Y. 1999) (which Defendants cite in their Sug-

gestions), held that an implied certification that a provider will adhere to the standard of care is appropriate if the standard of care is at the "heart" of the parties' agreement. This Court has previously held that the standard of care is indeed at the heart of the agreement between the parties. *See NHC*, 115 F.Supp.2d at 1155 ("when caring for the infirmed it is not the end product result that is crucial, it is the dignity and quality of life provided through the care process."). To the extent that implied certification is proper in healthcare cases, the facts of this case fit the definition set forth by previous case law.

Alternatively, it is likely that implied certification is not relevant herein because the Defendants are not being sued simply for violating the standard of care with regard to Residents 1 and 2.[3] Rather, Defendants are being sued because they allegedly failed to provide the services that they billed for. No certification, implied or otherwise, is necessary when the liability stems from the Defendants' activities of billing for procedures which they did not perform. This would plainly constitute fraud. The difficulty in proving that Defendants committed such a fraud lies in the per diem billing system utilized under Medicare/Medicaid. Obviously, if NHC billed the Government $4 for turning Resident 1 on July 18, 1998, but in fact no one actually performed the task, a clear cut case of fraudulent billing would be presented. However, we are not blessed with such pristine circumstances. NHC billed the Medicare/Medicaid programs for the over-all care of each of these residents on a per diem basis. As previously stated by this Court, in so doing NHC agreed to provide "the quality of care which pro-

---

**3.** For if this were the rule, every physician who committed malpractice on a Medicare/Medicaid patient and then submitted a claim for reimbursement for the procedure would be subject not only to malpractice liability from the patient, but also FCA liability from the Government. This Court does not believe that the FCA's reach extends that far.

motes the maintenance and the enhancement of the quality of life."[4] *Id.* at 1153. At some very blurry point, a provider of care can cease to maintain this standard by failing to perform the minimum necessary care activities required to promote the patient's quality of life. When the provider reaches that point, and still presents claims for reimbursement to Medicare, the provider has simply committed fraud against the United States. Whether the Government has demonstrated that a factual dispute remains as to whether NHC crossed into this admittedly grey area, is the proper focus of this Order.

In sum, whether implied certification is proper in the healthcare arena and whether the facts of this case fall under this theory is mainly irrelevant. The theory of liability advanced by the Government is that NHC billed Medicare and Medicaid for services which it knowingly did not perform. If true, NHC committed fraud and any certifications would be largely unimportant.

## 2. Falsity of the Claim

■ As stated above, Defendants dispute that the claims they submitted to Medicare and Medicaid were in fact false. They argue that Plaintiff has failed to produce any direct evidence that NHC failed to provide any specific care to either Resident 1 or 2. Plaintiff counters that it is not required to prove its case solely via direct evidence, and, furthermore, they have produced direct evidence that NHC failed to

provide all necessary and proper care. The Court agrees.

The Plaintiff has produced four types of evidence in support of its claim that NHC billed the Government for services which it knowingly did not render. First, Plaintiff has produced evidence that NHC had extreme staffing shortages during the billing periods relevant to this case. Defendants essentially admit that the record demonstrates some staffing shortages. This evidence might suggest that Defendants simply did not have enough staff present in their facility to provide all the care necessary for Residents 1 and 2. This evidence does not in-and-of-itself demonstrate fraudulent billing by NHC, but it certainly would be a relevant factor for a jury to consider when deciding whether NHC billed for acts which it did not (or simply could not) perform.

The second type of evidence presented by the Plaintiff is evidence of neglect and lack of care in general at the facility. The Plaintiff presents numerous accounts in the record of Division surveyors and resident family members observing residents who were not being cared for during the relevant billing period. These observations included an over-all foul odor within the facility, uncleanly conditions, wet residents, dirty residents, and residents who were not assisted in eating or to the bathroom. Again, these observations do not directly demonstrate that NHC billed the Government for care that it failed to give

**4.** While the Court concedes that this is an amorphous standard, it is not a standard without meaning. For instance, if a nursing home accepted a resident, provided absolutely no care to the resident, and then billed the Government for these non-performed services, it is quite clear that the nursing home would have committed fraud. At some point the care rendered to a patient can be so lacking that the provider has simply failed to adhere to the standards it agreed to abide by and has thus committed a fraud. Conversely,

if the Government and NHC simply disagreed about what acts of care-giving were necessary to properly maintain a resident's quality of life, there would clearly be no fraud. It is the Court's job in this Order to determine whether the Government has presented sufficient evidence to show that NHC's conduct might have fallen within that amorphous zone between fraud and simple disagreements as to proper care. It would then be the jury's function to determine which side NHC's conduct falls under.

Residents 1 and 2, but it is another relevant circumstantial consideration for the jury when determining whether the Plaintiff's claims of fraud are credible.

The third type of evidence is direct evidence of neglect in the care of Residents 1 and 2. Two Division surveyors interviewed Residents 1 and 2 and observed signs of neglect and improper care. Resident 1 was soiled with feces, complained of not being bathed, complained of not being assisted in eating, complained of not being assisted to the restroom, and had continuing problems with pressure sores. Resident 2 complained of not having her food choices honored, being served cold food, not having clean clothes, and of being dirty and itchy. She was observed during the interview to have been unclean and with a dirty catheter. All of these observations could lead a reasonable jury to believe that NHC was grossly neglecting these residents and not providing "the quality of care which promotes the maintenance and the enhancement of the quality of life."

Finally, the jury may further rely on the Plaintiff's fourth type of evidence, expert opinions. The Plaintiff offers the expert opinion of Barbara Primm who opines that NHC was not adequately staffed to meet the needs of its residence. The Plaintiff also offers the opinion of Dr. Kurt Merkelz who opines that the physical conditions of Residents 1 and 2 were caused by a lack of care on the part of NHC.[5] Both opinions might convince the jury that the claims submitted for Residents 1 and 2 were indeed false because NHC did not have the necessary staff to perform all the care for which it billed.

In sum, a reasonable jury could conclude from this evidence that Defendant did not have enough staff to properly care for Residents 1 and 2 as they promised to do pursuant to the terms of their Medicare/Medicaid agreements. This inference can be drawn from the evidence of staffing shortages, over-all neglect of the facility and residents, and the direct evidence of neglect of Residents 1 and 2. The inferences could be further bolstered by the expert witness opinions offered by Plaintiff. Accordingly, a genuine issue of fact remains as to whether Defendants billed the Government for services which it did not perform.

### 3. Knowledge

The Defendants next argue that even if the Medicare/Medicaid claims were in fact false, Defendants lacked the requisite knowledge requirement to be held liable under the FCA. In other words, Defendants claim that they did not knowingly submit false claims to the Government and, therefore, they cannot be held liable under the FCA. The FCA defines "knowing" and "knowingly" to mean that a person:

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

31 U.S.C. § 3729(b). The Defendants claim that Plaintiff's evidence fails to demonstrate any knowledge on the part of NHC that it knowingly submitted false claims. Defendants' assertion is once again based upon an incorrect assumption as to what Plaintiff is required to demonstrate.

The record reflects that a material issue of fact exists as to whether Defendants

---

**5.** Defendants argue in passing that both reports fail to meet the standards for admissibility under *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendants do not offer any arguments or evidence to support this conclusion at this time.

had knowledge of their severe staffing shortages. Defendants admit that there were indeed personnel shortages and the contemporaneous documentation indicates a plethora of correspondence dealing with the staffing issue. Accordingly, a reasonable jury could certainly find that NHC experienced staffing shortages during the relevant billing period. Whether the staffing shortages were so severe so as to give rise to the inference that Residents 1 and 2 were not being cared for despite billing statements that indicate otherwise, is entirely the province of the jury. Based upon complaints from staff, residents, surveyors and family members the Defendants knew or should have known that they had a staffing shortage that impinged upon their ability to properly care for their patients. Defendants also knew or should have known that if they did not have sufficient staff to properly care for their residents, then they should not have submitted bills to Medicare and Medicaid which represented that they provided such care.[6]

Defendants argue that Plaintiffs have presented no evidence that NHC had knowledge of any specific lack of care as to Residents 1 and 2. Essentially, NHC argue that even if they had knowledge that their staffing shortage was leading to malfeasant care in the facility as a whole, Plaintiff must still demonstrate that NHC had specific knowledge that Residents 1 and 2 were not receiving the care that they were supposed to receive. Defendants argument ignores the definition of knowledge

established by the FCA which does not require specific intent to defraud. Instead it allows a jury to find knowledge based on deliberate indifference or reckless disregard for the truth. If Defendants had knowledge that they had severe staffing shortages at their facility, then they had a duty to investigate to see whether all their residents, including Residents 1 and 2, were getting the minimum standard of care to which they were entitled. A reasonable jury could conclude from the record before this Court that Defendants knew that the claims for reimbursement which they submitted were false because NHC acted with reckless indifference as to whether Residents 1 and 2 were receiving all the care they were entitled to under Medicare and Medicaid.

 Finally, the Court holds that an entity who is charging the Government for a minimum amount of care provided to its residents should question whether understaffing might lead to undercare. The knowledge of the answer to that question is charged to the Defendants when they submitted their Medicare and Medicaid claim forms. In other words, a jury could reasonably find that NHC should have known if they were failing to provide all necessary care to Residents 1 and 2 at the time they submitted their claims for reimbursement.

**B. Other Claims**

The Defendants have also moved for summary judgment as to Counts II, III, IV, and V. In its Opposition to Defendants'

---

**6.** Once again extreme examples may serve to illustrate this point. If the Defendants provided only one nurse to care for all of its residents and simply allowed most of the residents to languish in bed with no assistance or care, no one would seriously quibble that NHC would be committing fraud by submitting claims for care reimbursement. In such a case, NHC knew that they did not provide sufficient staff to care for the residents and

yet they submitted claims for all the residents anyway. Certainly these are not the facts before us, but the illustration demonstrates that at some point staff levels and lack of care can become so lacking that billing for services when one knows how dismal the staffing situation is amounts to a fraud. The Plaintiff has brought forth enough evidence to present this argument to a jury.

Motion for Summary Judgment, Plaintiff fails to address these Counts or any of Defendants' arguments. The Court assumes that Plaintiff is abandoning these claims and wishes to move forward with its primary claim under the FCA. Accordingly, as to Counts II, III, IV and V the Court finds that Plaintiff has abandoned these claims.

## CONCLUSION

For the reasons set forth above, the Court hereby finds that genuine issues of material fact remains as to Plaintiff's claim of FCA violations by the Defendants under Count I. The Court also finds that Plaintiff has abandoned its claims under Counts II, III, IV, and V and said Counts are DISMISSED from this action. Accordingly, Defendants' Motion for Summary Judgment is hereby GRANTED in part and DENIED in part.

**IT IS SO ORDERED.**