**UNITED STATES of America, ex rel. Mary J. DOWNY, Plaintiff,**

v.

**CORNING, INC., et al., Defendants.**

**No. Civ.96–0378 BB/DJS.**

United States District Court,
D. New Mexico.

Oct. 13, 2000.

James A. Branch, Jr., Vernon Salvador, Albuquerque, NM, Edwin G. Winstead, Assistant U.S. Attorney, Albuquerque, NM, for plaintiff.

Hope S. Foster, Laura J. Oberbroeck-ling, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Washington, DC, Robert W. Lasater, Henry M. Bohnhoff, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for defendants.

## OPINION

BLACK, District Judge.

THIS MATTER comes before the Court for consideration of Defendants' motion to dismiss (Doc. 55) the fourth amended complaint filed in this case by Mary J. Downy ("Relator"). The Court has reviewed the submissions of the parties and the relevant law. For the reasons set forth below, the Court will deny the motion to dismiss.

### BACKGROUND

This is a *qui tam* action filed under the federal False Claims Act, 31 U.S.C. §§ 3729–3733 (Supp.2000) ("FCA"). Relator originally filed a complaint under seal, as she was required to do under Section 3730(b)(2). The United States requested, and was granted, several extensions of the statutory 60–day period permitted for the government to determine whether to intervene in a *qui tam* case. The United States eventually decided not to intervene in the case. Meanwhile, for reasons not made clear to the Court, Defendants were served with copies of the fourth amended complaint ("Complaint"), even though the seal had not been lifted and no permission to effect such service had been granted.

Relator's FCA claim is basically the following. Defendants operate a number of medical laboratories throughout the United States. During the period from 1988 to at least 1993, and perhaps beyond, Defendants submitted false claims for payment to several government programs, including the Medicaid and Medicare programs. Defendants did so by performing unnecessary blood tests and by inducing doctors to request unnecessary blood tests for many of their patients. The tests involved were the prostatic acid phosphatase ("PAP") test and the prostate-specific antigen ("PSA") test, both of which are designed to test for the presence of prostate cancer.

According to Relator, Defendants deceptively induced physicians to order both tests each and every time the physicians requested any prostate-cancer blood testing, despite Defendants' knowledge that in many situations only one of the tests was medically necessary. Defendants allegedly accomplished this result in two ways. First, Defendants combined both tests (often denominated "PSA/PAP") on their test order forms, and provided only one space to check when requesting the tests. Doctors who might otherwise have ordered only one test or the other were therefore led to check the space that automatically ordered both tests. Second, Defendants encouraged physicians to order both tests for their patients, by providing misleading information concerning the necessity of having both tests performed. According to Relator, Defendants knew that both tests were necessary in only a limited number of cases involving particular patients, but disseminated erroneous information that misled physicians into believing both tests should be performed any time one was performed. By using these fraudulent tactics, Defendants allegedly caused many medically unnecessary blood tests to be performed on Medicaid and Medicare patients, as well as patients of other programs funded by the government.

Defendants have moved to dismiss the Complaint with prejudice. In support of their motion, Defendants have raised a number of arguments. The Court will discuss each argument separately.

### Violation of Seal Procedure by Premature Service of Complaint

■ As discussed above, the FCA required Relator to file her complaint under seal. The purpose of this requirement is to allow the United States an opportunity to evaluate the lawsuit and the facts underlying the suit, whether the case is related to an ongoing criminal investigation, and whether to intervene in the suit. *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 245 (9th Cir. 1995). The complaint may not be served on a defendant until the court so orders. § 3730(b)(2). In this case, however, after the government declined intervention, Relator served her Complaint upon Defendants without obtaining an order from this Court allowing such service, and prior to the unsealing of the case. Defendants maintain the case should be dismissed due to this premature service of the Complaint.

■ As the Ninth Circuit pointed out in *Lujan*, nothing in the FCA indicates the penalty for premature service, or any other violation of the seal requirement, should be dismissal of the case. *Lujan*, p. 245. Instead, such a severe sanction should be reserved for cases involving great harm to the interests promoted by the seal provision. *Id.* Furthermore, because the aim of the provision is to protect the government's interests, it is prejudice to the government's interests, rather than the defendant's, that is the primary consideration in deciding on an appropriate sanction. *Id.*, p. 247. Given the government's decision not to intervene and to allow Relator to continue the case alone, there is little chance such prejudice occurred, and Defendants point to none. *See United States ex rel. Kusner v. Osteopathic Medical Center of Philadelphia*, 1996 WL 287259 (E.D.Pa. May 30, 1996) (where government had already decided not to intervene in *qui tam* suit, purposes of seal provision were not frustrated by premature service of complaint). Defendants do claim they were prejudiced by the premature service, because they had difficulty formulating a proper response to the Complaint without access to the case file, which remained under seal. This type of prejudice, however, is easily remedied. The case has now been unsealed, and Defendants have access to the materials they need. Defendants are free to prepare any additional responses they feel might be necessary. Due to the absence of any prejudice to the government, or any irremediable prejudice to Defendants, the Court will not dismiss the case as a sanction for Relator's prema-

ture service of the Complaint upon Defendants.

## Public Disclosure of Information Related to Relator's Complaint

■ Defendants raise a jurisdictional argument in support of dismissal, arguing Relator's lawsuit is based on publicly-disclosed allegations or transactions. Unless the relator is an "original source" of information, the FCA bars lawsuits that are based on the public disclosure of allegations or transactions, if such disclosure occurs in a criminal, civil, or administrative hearing, a congressional, administrative, or GAO report, hearing, audit, or investigation, or in the news media. *See* § 3730(e)(4)(A). This restriction is jurisdictional. *See United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 570–71 (10th Cir.1995). In addressing this jurisdictional question, if the Court considers matters outside the Complaint, the Court must treat the motion as a motion for summary judgment, rather than a motion to dismiss on the pleadings. *See United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1518 (10th Cir.1996). Defendants attached documentary material to their brief in support of the motion to dismiss, and Relator has also referred to material outside the Complaint. Therefore, the Court addresses this issue as a question of summary judgment, rather than a 12(b)(6) motion.

In determining whether the jurisdictional bar applies, several possible issues may arise, including the question of whether the relator was an original source of the information, whether the disclosure occurred in one of the specific sources listed in the FCA, whether the disclosure was made "public" within the meaning of the FCA, and whether the relator's complaint is "based upon" the disclosed information in the manner contemplated by the FCA. *See, e.g., United States ex rel. Fine v. Advanced Sciences, Inc.*, 99 F.3d 1000,

1004 (10th Cir.1996). In this case, Relator has declined to argue any issue except the last. In effect, then, Relator has conceded for purposes of this motion that the disclosures were "public" disclosures, that the disclosures were made in one of the sources listed in the FCA, and that she was not an original source of the disclosures. The Court therefore addresses only the question of whether Relator's action is based on the disclosed information.

■ Relator's position with respect to this question is straightforward. She argues her claim is not "based upon" the disclosed information, within the meaning of the FCA, because the disclosures did not involve "allegations or transactions." Instead, maintains Relator, the disclosures contained only general information concerning the PSA and PAP blood tests, and no information regarding Defendants' alleged fraudulent practices. Defendants disagree with Relator's characterization. To resolve the conflict, it is necessary to examine in detail the disclosures that, according to Defendants, should bar Relator's action.

According to Defendants, in 1994 the federal government, through a contractee ("AdminaStar"), began a nationwide project designed to develop correct "coding methodologies" for the submission of claims for payment for services provided to Medicare patients. One of the goals of this project was to identify tests that should not be billed together. For example, AdminaStar created a list of tests thought to be mutually exclusive. If one test was performed by a laboratory, AdminaStar proposed that payment could not be requested or made for another test deemed to be mutually exclusive. In addition, AdminaStar proposed a list of tests in which one of the tests was thought to be more complex than the other, and inclusive of the other.[1] The more complex test was

---

1. It is helpful to think of the question in criminal law terms—the less complex test would be analogous to a lesser included offense, entirely included within the more com-

plex test. Similarly, in mathematical terms, the less complex test would be a subset of the more complex test, and entirely included within the more complex test.

called the "most extensive procedure." In early 1996, AdminaStar proposed to include the PAP and PSA tests on this most-extensive-procedure list, with PSA considered the more complex procedure. If this proposal had become final, only the PSA test could be billed to the Medicare program, even if both the PAP and PSA tests were performed.

In response to AdminaStar's proposal, several members of the public contacted AdminaStar to express concern that the PAP and PSA tests were improperly included on the most-extensive-procedures list. Their comments pointed out that PAP and PSA are different tests, serving different purposes, and that both tests might be medically necessary to identify the presence of prostate cancer. As a result of these comments, AdminaStar removed the PAP and PSA tests from the list of most extensive procedures, thereby continuing to allow billing and payment for both tests.

Defendants argue that Relator's lawsuit is directly related to the issue of double-billing for both the PSA and PAP tests, and is therefore based upon the public disclosures discussed above. Relator, on the other hand, contends that public disclosure of this general information is not sufficient to bar her action. She points out that the issue discussed by AdminaStar was whether a medical provider should ever be allowed to bill for both the PSA and PAP tests. Her claim, on the other hand, is that Defendants effectively prevented physicians from choosing one test or the other, even when only one test was medically necessary. In addition, she argues that public knowledge or disclosures of the fact that fraud or waste is occurring in a certain area of federal spending, in general, is not the type of public disclosure contemplated by the FCA. Instead, there must be specific disclosure that a party, or a limited number of parties who would be easily identifiable, are engaged in a particular type of fraudulent activity.

■ Resolution of this issue depends on the standard to be used in deciding what "based upon" a "public disclosure" means

under the FCA. On the one hand, the Tenth Circuit has held that the jurisdictional bar applies even where a relator's complaint is based in any part upon publicly disclosed allegations or transactions. *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548, 553 (10th Cir.1992). It could be argued that the allegations of the Complaint are based, at least in part, on the information concerning billing for both PSA and PAP tests. On the other hand, the material that must have been publicly disclosed must consist of allegations or transactions, not simply general information. *Id.* Faced with the question of how much information is enough to erect the "public disclosure" jurisdictional bar, the District of Columbia Circuit has created a standard that has been adopted by many other courts. *See United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C.Cir.1994). According to *Springfield Terminal*, Congress intended to prohibit *qui tam* actions "only when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain." *Id.* If no allegation of fraud has been made publicly, then all the elements of the fraud must have been disclosed publicly, so that a person could infer the existence of fraud from the public disclosures. *Id.*

The broad interpretation of *Springfield Terminal* has been adopted by several other Circuits. *See United States ex rel. Jones v. Horizon Healthcare Corp.*, 160 F.3d 326, 331 (6th Cir.1998); *United States ex rel. Dunleavy v. County of Delaware*, 123 F.3d 734, 741 (3d Cir.1997); *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1513 (8th Cir.1994). The Ninth Circuit has adopted a similar standard and has cited *Springfield Terminal* as being in agreement with that standard. *See Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1473 (9th Cir.1996). Prior to *Springfield Terminal*, the Tenth Circuit recognized that the statutory requirement "based upon" is properly understood to mean "supported by." *See Precision Co.,*

971 F.2d at 552. Since that time the Tenth Circuit has cited *Springfield Terminal* approvingly, and its cases appear to be consistent with this approach.

In *United States ex rel. Fine v. Advanced Sciences, Inc.,* 99 F.3d 1000, 1005–06 (10th Cir.1996), the Tenth Circuit held the relator's complaint was based on publicly disclosed transactions or allegations. The information disclosed was an audit performed by the Office of the Inspector General, questioning a number of costs claimed by a federal contractor. The relator's *qui tam* complaint raised claims based in large part on those same questioned costs. The Tenth Circuit stated that the question to be answered was whether "substantial identity" existed between the publicly disclosed allegations or transactions and the *qui tam* complaint. Similarly, in *United States ex rel. Fine v. MK–Ferguson Co.,* 99 F.3d 1538, 1546–47 (10th Cir.1996), the public information disclosed was another audit performed by the Office of the Inspector General, revealing unallowable costs charged by the federal contractor. The relator's complaint tracked the conclusions of the audit, and the Tenth Circuit held the complaint was based on public disclosures. The Tenth Circuit considered the public-disclosure question again in *United States ex rel. Fine v. Sandia Corp.,* 70 F.3d 568 (10th Cir.1995). In that case, the Tenth Circuit held, citing *Springfield Terminal,* that "the public disclosure of the material elements of the fraudulent transaction bars *qui tam* actions even if the disclosure itself does not allege any wrongdoing ." *Id.* at 572. A General Accounting Office ("GAO") report had discussed a fund-use practice prevalent at several laboratories owned by the United States but operated by private or university contractors. The practice involved, essentially, the diversion of funds from certain research contracts or programs to other laboratory programs. Relator filed a *qui tam* suit accusing one particular laboratory of engaging in this practice. The Tenth Circuit held the lawsuit was based upon the publicly-disclosed GAO report, for several reasons. First, the defendant laboratory was one of only nine readily-identifiable government laboratories that were the subject of the GAO report. Second, since Congress and the GAO already knew of the practice and knew only nine laboratories were involved, it was certain that any further investigation into the practice would include the defendant in the *qui tam* case. *Id.* at 571. Therefore, this was a case where the government had already been pointed in the direction of the alleged wrongdoer and had been provided the information necessary to begin investigating the alleged false claims.

It is apparent that in the Tenth Circuit cases, a particular alleged wrongdoer had been identified in the public disclosures or would be readily identifiable given the information in those disclosures, and a specific explanation of the alleged wrongdoing had been provided. This satisfies the *Springfield Terminal* standard's requirement that either an allegation of fraud have been made publicly, or the elements of the fraud claim have been made public. In the case before the Court, however, the only information made public was a debate about whether laboratories should ever be able to charge for both a PAP test and a PSA test. Furthermore, the debate centered around the question of whether the PAP test was included in the supposedly more complex PSA test, not whether the PAP test's efficacy was in question or double-testing encouraged. No allegation of wrongdoing was made during the public discussion; the only question was what testing policy should be adopted in the future, not whether fraud was involved in past billing practices. Finally, no particular party was identified as having engaged in the practice of inappropriate billing for both a PAP and PSA test, and there has been no showing that the number of laboratories submitting claims for such tests was so small that it would be a simple matter to identify the laboratories that might be engaged in the practice.

Relator's Complaint, on the other hand, specifically identifies Defendants as having

engaged in a particular wrongful practice. She claims Defendants knew, as early as 1987, that the PAP test was of doubtful medical use in many circumstances. She also claims Defendants continued to promote the use of both the PAP and PSA tests in all circumstances, for all men. She maintains Defendants, through their test-order forms and promotional materials, made it impossible for physicians to order the PAP and PSA tests separately, even if the physicians, against Defendants' recommendation, wished to do so. Comparing these allegations to the general discussion of whether the PSA test is a "most extensive procedure" in relation to the PAP test, the Court does not find the necessary "substantial identity" between the allegations of Relator's Complaint and the publicly-disclosed information, despite the fact they both involve the same general subject matter. *See Advanced Sciences.* Furthermore, that public information does not contain allegations of fraud and does not contain the material elements of a fraud claim, as is required by the *Springfield Terminal* standard. Therefore, summary judgment will be denied on this jurisdictional issue.

### Separation of Powers Issue

■ Defendants maintain that allowing Relator to proceed with this lawsuit, even though the government has declined to intervene, violates Article II, § 3 of the United States Constitution, the Take Care Clause.[2] Defendants' argument is that the executive branch of the federal government is responsible for investigating and prosecuting alleged violations of federal law; that Congress, through the FCA, has impermissibly encroached on the executive branch's powers; and that the FCA's *qui tam* provisions are therefore unconstitutional to the extent they allow a relator to proceed with a lawsuit in the absence of intervention by the government.

This question has been exhaustively discussed in two different Circuit opinions.[3] In the first, *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 751–57 (9th Cir. 1993), the Ninth Circuit analyzed the issue and concluded the *qui tam* provisions of the FCA are constitutional. Subsequently, the Fifth Circuit, in a split decision, came to the contrary conclusion. *See Riley v. St. Luke's Episcopal Hosp.,* 196 F.3d 514, 524–31 (5th Cir.1999). Rehearing *en banc* has been granted in the *Riley* case. 196 F.3d 561. Prior to these two lengthy opinions, the Second Circuit spent one paragraph finding the *qui tam* provisions constitutional, in *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1155 (2d Cir.1993).[4]

**2.** Defendants originally raised a challenge to Relator's standing as a *qui tam* plaintiff, but that issue has been decided adversely to Defendants by the Supreme Court. *See Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 1858, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000).

**3.** The separation-of-powers aspect of *qui tam* has also sparked extensive analysis by the academic community. *See* Evan Caminker, *The Constitutionality of Qui Tam Actions,* 99 Yale L.J. 341 (1989); Sean Hamer, *Lincoln's Law: Constitutional and Policy Issues Posed by the Qui Tam provisions of the False Claims Act,* 6 Kan.J.L. & Pub. Policy 89 (1997); James T. Blanch, Note, *The Constitutionality of the False Claims Act's Qui Tam Provision,* 16 Harv.J.L. & Pub. Policy 701 (1993); Frank A. Edgar, Jr., Comment, *"Missing the Analytical Boat": The Unconstitutionality of the Qui Tam Provisions of the False Claims Act,* 27

Idaho L.Rev. 319 (1990); Robert E. Johnston, Note, *1001 Attorneys General: Executive–Employee Qui Tam Suits and the Constitution,* 62 Geo.Wash .L.Rev. 609 (1994); Thomas R. Lee, Comment, *The Standing of Qui Tam Relators Under the False Claims Act,* 57 U.Chi. L.Rev. 543 (1990); Ara Lovitt, Note, *Fight for Your Right to Litigate: Qui Tam, Article II, and the President,* 49 Stan.L.Rev. 853 (1997); John P. Robertson, Comment, *The False Claims Act,* 26 Ariz.St.L.J. 899 (1994).

**4.** The *qui tam* provisions were also found constitutional by the Sixth Circuit, in a brief discussion contained in *United States ex rel. Taxpayers Against Fraud v. General Electric Co.,* 41 F.3d 1032, 1041–42 (6th Cir.1994). In that case, however, the government did intervene in the relator's lawsuit, so the precise point at issue in this case—the constitutional effect of the government's refusal to intervene—was not present. *See also United*

The Court does not find it necessary to add anything to the extensive discussions contained in *Kelly* and *Riley*.[5] As those opinions point out, the central issue is whether the executive branch retains enough control over the litigation to satisfy the Constitution. *Riley* found it significant that under the *qui tam* provisions, the executive branch has no control over whether a lawsuit is initiated. 196 F.3d at 526. *Kelly*, on the other hand, found it more significant that the executive branch may terminate such a lawsuit, over the relator's objections, as long as the relator has had an opportunity for a hearing. 9 F.3d at 754. The Court agrees with *Kelly*'s analysis. The Court finds *Kelly*'s comparison of the *qui tam* provisions of the FCA, to the independent counsel provisions found constitutional in *Morrison v. Olson*, 487 U.S. 654, 693–96, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988), to be especially persuasive. As *Kelly* discusses, the executive branch retains more control over an FCA *qui tam* lawsuit than it does over an independent-counsel proceeding. If the independent-counsel statute is constitutional, then, logic dictates the FCA's *qui tam* provisions are as well. *See also United States ex rel. Krohn v. Sun West Services, Inc.*, No. CIV 97–0644 (D.N.M.2000) (choosing to follow *Kelly* and *Kreindler*). Defendants' motion to dismiss on this ground will be denied.

### Statute of Limitations

**■ Length of Limitations Period:** Defendants have raised several issues concerning the statute of limitations applicable to this case. The most significant of these issues is the question of whether the limitations period should be six years, ten years, or some period in between. The issue arises because the FCA provides that no civil action may be brought: "(1) more than 6 years after the date on which [a violation] is committed, or (2) more than 3 years after the date when facts material to the right of action are known or reasonably should have been known by the official of the United States charged with responsibility to act in the circumstances, but in no event more than 10 years after the date on which the violation is committed, whichever occurs last." 31 U.S.C. § 3731(b). Defendants maintain the six-year period of subsection (1) applies to this case, since the government has declined to intervene and the three-year tolling provision of subsection (2) may only be taken advantage of by the government. Plaintiff contends the tolling provision applies to actions prosecuted solely by private relators as well as to actions in which the government has intervened. She also contends the government first obtained knowledge of the false claims when she filed her original complaint, and her action is therefore timely as to all violations occurring ten years prior to 1996, the year she filed that complaint.

A few courts have considered the question of whether a private relator is entitled to take advantage of the three-year tolling provision of Section 3731(b)(2). Unfortunately these courts have not been uniform in their responses. In fact, three different approaches to the issue have been formulated. Two district courts have held that the three-year tolling provision applies only if the government has intervened in the action. *See United States ex rel. Amin v. George Washington Univ.*, 26 F.Supp.2d 162, 172 (D.D.C.1998); *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 6 F.Supp.2d 263, 265 (S.D.N.Y.1998). These courts have reasoned that the tolling provision speaks in terms of an "official of the United States" obtaining knowledge of the possi-

---

*States ex rel. Stevens v. State of Vermont Agency of Natural Resources,* 162 F.3d 195, 219 (2d Cir.1998), *rev'd, Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 1858, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (in dissent, Judge Weinstein observed *qui tam* is on "shaky constitutional ground with respect to the separation of powers embodied in Article II's Appointments and Take Care Clauses").

**5.** For this reason, the Court denies Defendants' request for supplemental briefing on this issue.

ble FCA violation. *See also United States ex rel. Koch v. Koch Industries,* 188 F.R.D. 617, 623 (N.D.Okla.1999) (finding logic of *Amin* and *Thistlethwaite* persuasive, but noting it need not choose that approach in the case at hand). This explicit reference to a government official, according to *Amin* and *Thistlethwaite,* indicates Congress intended the tolling provision to apply only to the government. This is the approach advanced by Defendants in this case.

In contrast to the *Amin* and *Thistlethwaite* approach, the Ninth Circuit and at least one district court have held that a relator is placed in the same position as the United States with respect to the tolling provision. That is, the three-year limitations period found in Section 3731(b)(2) begins to run when the relator has knowledge, or should have knowledge, of the facts concerning the FCA violation. *See United States ex rel. Hyatt v. Northrop Corp.,* 91 F.3d 1211, 1214–18 (9th Cir. 1996); *United States ex rel. Bidani v. Lewis,* 1999 WL 163053 (N.D.Ill.1999). Both of these opinions examine the legislative history of the FCA, and conclude that Congress often referred only to the government even though it is obvious Congress intended to include private relators in the provision. As just one example, in Section 3731(c), the FCA provides, "In any action brought under section 3730, the United States shall be required to prove all essential elements of the cause of action ... by a preponderance of the evidence." Even though they are not specifically referenced, it is clear Congress did not intend to impose a different burden of proof on relators than on the government. Based on this reasoning, and on the purposes of the FCA, *Hyatt* and *Bidani* concluded the relator should be substituted for the "official of the United States charged with responsibility to act" for purposes of the three-year tolling provision. *See also United States ex rel. Saaf v. Lehman Bros.,* 123 F.3d 1307 (9th Cir.1997) (following *Hyatt* ).

Finally, one district court has adopted a position, based on the literal language of Section 3731, which is the most favorable to relators. In *United States ex rel. Colunga v. Hercules Inc.,* 1998 WL 310481 (D.Utah 1998), the court held that Section 3731(b)(2) does apply to private relators. In addition, the court held, based on the literal language of the provision, that the three-year period begins to run not when the relator obtains knowledge of the FCA violation, but when knowledge of that violation is communicated to the "official of the United States" referred in the provision. In other words, under *Colunga,* a relator may discover the FCA violation, wait more than three years, and then file suit, thus providing the government with the notice of violation contemplated by Section 3731(b)(2). The *Colunga* court reasoned that a relator who discovers a false claim may be reluctant to act for a number of reasons, including lack of resources, timidity, or lack of knowledge about the FCA and its procedural requirements. *Colunga* concluded that the Congressional intention to expand the pursuit of fraudulent claims, expressed in the 1986 amendments to the FCA, would be frustrated if the *Hyatt* interpretation of the provision were adopted. The *Colunga* approach is the one advocated by Relator in this case.

In the Court's view, each of these three approaches has some logical appeal, each has certain benefits, and each has practical drawbacks. The *Thistlethwaite/Amin* approach has the advantage of relying on the plain language of the statute. However, this approach's insistence that only an "official of the United States" may take advantage of the tolling provision ignores the structure of the FCA, which often refers only to the United States when it is obvious Congress intended the reference to include relators. Furthermore, the legislative history discussed in *Hyatt* and *Bidani,* and examined by this Court, makes clear that the Congressional intent behind the tolling provision is to ensure the government's rights are not lost through successful deception on the part of the FCA defendant. This intent is no different

where the lawsuit is a *qui tam* suit in which the United States has chosen not to intervene, and nothing in the FCA indicates the government's rights should be more at risk simply because the government has decided to refrain from intervention.[6] The government may have many reasons for its decision not to intervene in an FCA case, including lack of available Assistant United States Attorneys or respect for the skill of the relator's attorneys. The Court sees no reason the government should be forced to intervene, to gain the benefit of the three-year limitations period, in order to protect its rights. This is exactly what would happen, however, under the *Thistlethwaite/Amin* approach, which applies the three-year period to the government but not to a relator.

The *Hyatt/Bidani* approach, substituting the relator for the United States, is consistent with the structure of the FCA as reflected in other provisions. In addition, as these cases discuss, this approach prevents a relator from in effect setting her own statute of limitations. If a relator's knowledge of the violation is irrelevant, the relator can simply bide her time, letting the false claims pile up (assuming there is an ongoing practice of submitting such claims), and then notify the government (by filing suit) at the last possible moment.[7] One drawback to this approach, however, is that it still forces the government to intervene to protect its rights, where the relator has waited more than three years following notice of the violation to bring suit.

The *Colunga* approach also relies on the literal language of the statute, ignoring the fact that "United States" also often includes "relator" in the statutory scheme. *See Koch*, 188 F.R.D. at 623. It does not seem entirely logical to allow the substitution of "relator" for "United States" for

some statutory purposes, but not for others. Furthermore, this approach, as discussed above, would allow a relator to establish her own statute of limitations, by withholding information concerning the violation from the government in the hope of gaining a larger recovery as the false claims accumulate. On the other hand, this approach has the benefit of being most protective of the government's interests, since the government obtains the benefit of the tolling provision whether or not it decides to intervene in the lawsuit.

After considering all of the above factors, the Court will adopt the *Hyatt/Bidani* approach to this question. Although the Congressional intent with respect to private relators is not always entirely clear in the FCA, due to the omission of any mention of relators in many parts of the statute, it is apparent that for the most part Congress intended relators to be on the same procedural footing as the United States. Also, as mentioned above, it does not seem correct to pick and choose the times when "relator" will or will not be substituted for "United States" in the statute. Finally, the Court agrees that Congress most likely did not intend to allow relators to sit back indefinitely and allow false claims to accumulate, acting only in time to avoid the ten-year statute of repose.

In this case, no evidence has been presented as to when Relator first learned of Defendants' alleged false claims. No decision will be made at this time, therefore, as to the effect, if any, the three-year tolling provision discussed above will have on the litigation.

 **When the Case Commences for Statute–of–Limitations Purposes:** Defendants raise a novel argument, con-

---

6. It is important to remember that even when a relator proceeds alone, the United States still receives the lion's share of any recovery gained from the action, with the relator's share limited to no more than thirty percent of the recovery. 31 U.S.C. § 3730(d)(2).

7. Of course, a relator who follows such a practice risks losing the claims entirely, because if the false claims come to light through a public disclosure, the relator will lose the ability to bring a *qui tam* lawsuit under the FCA. *See* discussion above concerning jurisdictional public-disclosure bar.

tending this case did not commence, thus ending the running of the limitations period, until the complaint was unsealed. In other words, whatever limitations period applies should be calculated backward from the date of unsealing, rather than the date Relator filed her action. Defendants maintain any other interpretation of the statute would be unfair, would be contrary to the FCA, and would render the FCA unconstitutional. Defendants urge the Court to examine critically this issue of first impression.

Critical examination of Defendants' argument leads to the conclusion that it is contrary to the language, structure, and purposes of the FCA. In Section 3730, referring to actions by private persons, the statute states that a person may "bring a civil action" for violation of the FCA. Section 3730 then continues with the provisions regarding service of the complaint on the government, sealing the complaint for sixty days (plus extensions), and other procedural matters. Then, in Section 3731, the statute provides that "a civil action under section 3730 may not be brought" after the periods of time set out in the Section. It is apparent that the limitations provisions of Section 3731 are referring to the relator's initial act of filing the civil action, not to the later date when the complaint is unsealed. Furthermore, Defendants' argument, if adopted, would pressure the government to act immediately to decide whether to intervene in a relator's lawsuit, rather than requesting extensions of the sixty-day period for such decision, as allowed by Sections 3730(b)(2) and (3). While this may be a preferable policy choice for defendants in an FCA case, nothing in the statute or in the legislative history indicates Congress intended such a result. In addition, Defendants' argument is unfair to relators, who can object to an extension requested by the government but have no power to prevent it from being granted; under Defendants' argument, each time an extension is granted to the government more potential false-claim recoveries recede behind the barrier of the continuously-moving limitations pe-

riod. Finally, Defendants' interpretation runs contrary to established federal law, which holds a case is initiated (and the statute of limitations tolled) when the complaint is filed. *See, e.g., Gilles v. United States,* 906 F.2d 1386, 1388–89 (10th Cir. 1990) (Federal Tort Claims Act case); *Caldwell v. Martin Marietta Corp.,* 632 F.2d 1184, 1188 (5th Cir.1980) (Title VII case); F.R.C.P. 3 (a civil action is commenced by filing a complaint with the court). If Congress had intended to depart from this established body of law, such intention would certainly have been made explicit in the statute.

█ Defendants' constitutional arguments are similarly without merit under existing law. Furthermore, Defendants have not mustered the type of authority or argument that would warrant the drastic action of declaring the FCA unconstitutional. For example, Defendants argue that as long as the complaint remains sealed they are deprived of due process, because they have no opportunity to investigate the claims, unless the action is construed to begin on the date of unsealing. Defendants cite scant authority for this proposition. The Court notes that criminal actions often remain sealed, while the target of the criminal action remains unaware of his status as a target. *See, e.g., United States v. Bracy,* 67 F.3d 1421, 1426–27 (9th Cir.1995) (sealed indictment tolls statute of limitations; no due process violation results); *United States v. Edwards,* 777 F.2d 644, 647–48 (11th Cir. 1985) (same); *see also* Pamela H. Bucy, *The Path from Regulator to Hunter: The Exercise of Prosecutorial Discretion in the Investigation of Physicians at Teaching Hospitals,* 44 St. Louis L.J. 3, 37 (2000) (discussing comparisons between FCA cases and criminal actions). If sealing a criminal indictment is constitutional, it seems illogical that sealing an FCA complaint results in a violation of the Constitution, even if the running of the limitations period is cut off at the time of filing. The Court declines to interpret the FCA in the

manner suggested by Defendants as the only means of avoiding the constitutional invalidity they posit.

Defendants make a cursory argument to the effect that Relator's claims are stale and must therefore be dismissed. Without actual evidence of such staleness, rather than mere argument, the Court has no basis for such dismissal. In sum, the Court will not adopt Defendants' construction of the FCA limitation-of-action provision, and denies the motion to dismiss on statute-of-limitations grounds.

## Failure to Plead Fraud With Particularity

Defendants maintain, and Relator does not contest, that the pleading-fraud-with-particularity requirement of Rule 9(b) applies to FCA *qui tam* actions. Fed. R.Civ.P. 9(b); *see United States ex rel. Pogue v. American Healthcorp., Inc.,* 977 F.Supp. 1329, 1332 (M.D.Tenn.1997) (suits filed under FCA must meet heightened pleading requirements of Rule 9(b)). At the same time, the requirements of Rule 9(b) must be read in conjunction with the principles of Rule 8, which mandates simple, concise, and direct pleadings. *See Schwartz v. Celestial Seasonings, Inc.,* 124 F.3d 1246, 1253 (10th Cir.1997). A complaint satisfying Rule 9(b), therefore, must set forth the time, place, and contents of the false representations, as well as the identity of the person making the representations and the consequences flowing from the representations. *Id.*

Relator's Complaint names as Defendants Corning, Inc., Corning Clinical Laboratories, Inc., Corning Life Sciences, Inc., Metpath Corning Clinical Labs, Inc., and Metpath, Inc. The Complaint alleges that certain of these Defendants operate laboratories around the country, and that certain other Defendants are parent corporations of the other Defendants. The Complaint further alleges the Defendants engaged in the pattern and practice of fraudulent activity described above—by using deceptive test order forms and by disseminating deceptive information concerning the necessity of performing both the PSA and PAP tests, Defendants induced physicians to order many medically unnecessary tests and then charged the costs of those tests to the government.

▮▮▮ Defendants argue the Complaint is deficient under Rule 9(b) for several reasons. First, they maintain it does not specify, which Defendant did what, and instead lumps all Defendants together in conclusory fashion, alleging "Defendants" submitted false claims to the government. Second, they point out the Complaint does not identify a single instance in which a false claim was actually submitted to the United States for payment, relying instead on the general allegations concerning the allegedly fraudulent scheme. Finally, they maintain the Complaint does not specify a time frame as to when the supposed false claims were submitted for payment, and instead avers a general time frame from 1988 to 1993.

Relator incorporated a number of documents into her Complaint. These documents are, for the most part, test order forms published and allegedly disseminated by Metpath Corning, Metpath Incorporated, and Metpath as a Corning Clinical Laboratory. The Complaint, therefore, adequately identifies these Defendants as the entities alleged to have used deceptive test order forms to further Defendants' submissions of false claims. In addition, as to Corning, Inc., Corning Life Sciences, Inc., and Corning Clinical Laboratories, the Complaint maintains they are parent corporations of Metpath and other Defendant laboratory companies, and claims they are liable for the actions of their subsidiaries. As to these Defendants also, therefore, the Complaint sufficiently alleges the basis of Relator's claim that they are liable for the alleged false claims submitted to the government.[8]

---

**8.** Defendants have not made any argument concerning parent/subsidiary liability in this case, and the Court expresses no opinion as to whether the Complaint alleges sufficient facts to state such a claim.

Defendants' other arguments concerning lack of particularity are more troubling. It is true that, where the number of allegedly fraudulent acts is large, and the acts are alleged to have occurred over a long period of time, less specificity is required to satisfy the heightened pleading requirements of Rule 9(b). *See, e.g., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1039 (S.D.Tex.1998). However, there is authority for the proposition that at least some specific examples of the alleged false claims must be provided in the complaint. *See, e.g., United States ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 2000 WL 17838 (E.D.La.2000) (relator failed to identify a single specific occasion when the defendant performed an unauthorized urinalysis test, and failed to identify a single instance when the defendant's test requisition forms caused an unauthorized test to be performed; relator's action dismissed); *State of California ex rel. Mueller v. Walgreen Corp.*, 175 F.R.D. 631, 635–36 (N.D.Cal.1997) (complaint failed to provide any specific examples of prescriptions that were "short-filled" or any other examples of particular instances of wrongdoing by the defendant; complaint found inadequate, leave to amend granted). There is also authority to the contrary. *See United States ex rel. Pogue v. American Healthcorp., Inc.*, 977 F.Supp. 1329, 1333 (M.D.Tenn.1997) (*qui tam* complaint was sufficient where it generally described fraudulent scheme to submit false Medicare and Medicaid claims, even without identification of any specific dates of claims or specific employees).

Relator's Complaint in this case appears similar to the complaint in *Pogue*. The Complaint adequately describes an allegedly fraudulent scheme, resulting in the submission of false claims for unnecessary medical tests. By attaching the test requisition forms to the Complaint, each of which contains only one blank to check for "PSA/PAP" tests, Relator adequately alleged the general mechanics of the scheme. However, Relator failed to provide a single example of an instance in which a physician was induced to request an unnecessary PAP test, as a result of the test requisition forms or Defendants' representations concerning the PAP test. The Court notes some form of limited discovery would probably be necessary to allow Relator to provide such specific examples, if they exist, since information concerning the physicians who requested PSA/PAP tests from Defendants' laboratories is undoubtedly in Defendants' possession rather than the public domain. *See United States v. NHC Healthcare*, 2000 WL 1375562 (W.D.Mo.2000); *Luckey v. Baxter Healthcare*, 1996 WL 242977 (N.D.Ill.1996). The Court is of the opinion such arguments are, therefore, more appropriately handled at the summary judgment stage if facts to support Relator's claims fail to materialize. Therefore, the Court will find Relator's complaint satisfies the requirements of Rule 9(b), even without specific examples of false claims submitted to the United States.

**CONCLUSION**

Based on the foregoing discussion, Defendants' motion to dismiss will be denied.

**ORDER**

A Memorandum Opinion having been entered this date, it is hereby ORDERED as follows: Defendants' motion to dismiss (Doc. 55) is DENIED.